OPINION. Raum, Judge: This is primarily a factual controversy, which has been resolved in large part by our findings of fact. The Commissioner determined the deficiencies by use of the increase in net worth method, making appropriate adjustments for nondeductible expenditures. The net worth method is not a system of accounting. Where the taxpayer’s increase in net worth is substantially in excess of his reported income and where the discrepancy cannot be reasonably explained as being attributable to gifts or inheritances or other nontaxable receipts, the net worth method furnishes persuasive evidence of unrepórted income. And in determining the amount of net income for any such period it is necessary to add all nondeductible expenditures made by the taxpayer during that period, for such expenditures represent additional unexplained resources available to the taxpayer, over and above the increase in net worth.[1] Other adjustments, such as deductions for depreciation, must also be made. The taxpayer has made no effort whatever to show his correct income for any of the years in controversy,[2] and does not contest many of the items on the Commissioner’s net worth statement; however, he challenges certain items in that statement. The record is voluminous and it would serve no useful purpose to analyze the evidence and set forth the reasons for our findings. The crucial facts in dispute turned largely upon the credibility of petitioner and his alleged wife, Eose Potson. We had ample opportunity to observe both of them on the witness stand for extended periods and it is our conclusion that both of them were careless with the truth.[3] Our findings in many instances reflect our lack of confidence in their credibility. We did not, of course, resolve every issue of fact against petitioner; we appraised the evidence in the light of its credibility, taking into account the entire record, and made our findings accordingly. Our task was a difficult one, but we conscientiously undertook to perform it, exercising our best judgment on all the evidence. Although, as already indicated, we do not intend to discuss all the evidence, we shall comment upon some of the major points of difference between the parties. 1. At the outset there is a sharp dispute between the parties as to the amount of cash on hand or deposited in banks which petitioner had on December 31, 1935. The Commissioner contends that petitioner had only $15.03 at that time. Petitioner asserts that he had over $200,000. There is support in the record for the Commissioner’s contention. Starting with facts disclosed in an application for a bank loan in 1930 and after making adjustments based on reported income and known expenditures from 1930 through 1935, the Commissioner has made out a logical case for his position. He has also undertaken to fortify that position with evidence tending to show that petitioner was short of money in dealing with his creditors. However, we are convinced by other evidence that the Commissioner’s position is unrealistic. Potson was a man who had been engaged in illegal activities on an extensive scale. He operated a thriving night club business. There was considerable evidence that he had available substantial amounts of cash during this period. However, we do not accept petitioner’s testimony as to the amount of cash on hand on December 31, 1935, for we think that the amount urged by him was considerably inflated. We cannot, therefore, make either the finding requested by the Commissioner or the finding requested by petitioner. Neither would be in accord with our appraisal of the facts. In the circumstances, we have used our best judgment, based on a study of all the evidence, and in our Findings of Fact we have set forth our determination of the amount of cash owned by petitioner on December 31 of each of the years 1935 to 1943, inclusive. Cf. Cohan v. Commissioner, 39 F. 2d 540, 544 (C. A. 2). 2. The Commissioner disallowed the marital exemption for Rose Potson, claimed by petitioner on his returns, on the ground that Potson and Rose were not married during any of the taxable years or living together during the years 1940 to 1943, inclusive. Petitioner contends that they were married in Milwaukee, Wisconsin, in 1908. As a basis for that disallowance, the Commissioner introduced evidence that Potson, on numerous occasions in various documents (such as his application for naturalization in 1915), claimed that he was unmarried and that the records of the city of Milwaukee, Wisconsin, did not disclose a marriage between petitioner and his alleged wife. That evidence is highly persuasive, and the matter is not free from doubt. However, after considering other evidence to the contrary, and taking into account the entire record it is our best judgment on all the evidence that Potson and Rose were married during the taxable years. We also have concluded that they were living together during the years 1940 to 1943, inclusive, although Rose was in California and Potson spent part of his time in Chicago. He maintained and owned a residence in California and when he was there, he lived in that home with Rose. We decide this issue in petitioner’s favor. 3. A major point of disagreement between the parties concerns the extent of Rose Potson’s investment in certain properties, title to which was taken in the name of the “Harrison and State Building Corporation,” and other real properties; her investment in United States savings bonds; and her ownership of funds deposited in an account in the California Bank, Beverly Hills, California. Petitioner argues that payment in whole or in part for certain of the properties which the Government has charged to him on his net -worth statement was made by his wife from her personal funds and that the amount charged to him should be decreased by the amount of her contribution. This contention is based primarily on testimony given by him and his wife. We have not accepted this testimony, since we did not find it credible. We have rejected as unworthy of belief Rose Potson’s story of the large accumulation of cash which she allegedly derived from her operation of the two “hotels” in the vice district up to 1912 and which in large part she allegedly retained intact up to the taxable years. Among other things, petitioner had made prior admissions to the effect that his wife had no assets other than what he had furnished to her. Moreover, the protective mortgages which petitioner took from the Harrison and State Building Corporation cast grave doubt upon the truthfulness of the testimony that Rose Potson supplied funds for the purchase of such properties. Although some of the stock in that corporation stood in her name, we are satisfied that she was not the real owner of such stock; she and the other stockholders of record were merely the nominal owners of stock which in fact belonged to petitioner. While it may have been true that Rose Potson had custody of cash which she made available to consummate several of the disputed purchases, we are convinced that such cash had its source in pé-titioner, that it actually belonged to him, and must therefore be charged to him. We have also resolved the issues of ownership of the United States savings bonds and the account in the California Bank contrary to Potson’s position. The difficulties with that position are due, here also, to the lack of credibility of Potson and his wife. Money from the California Bank was used to pay personal expenses of Potson and money belonging to him was deposited therein. Potson’s position as to the United States savings bonds must be examined in the light of admissions [4] made by him as to his ownership of bonds in an amount that was not less than the aggregate amount of bonds purportedly owned by him and his wife. We have carefully considered all of the evidence and have decided that the issue of how much of the assets and expenditures charged to Potson was in fact his must be fully resolved in favor of the Commissioner. 4. Petitioner contends that he should be given credit in determining his increase in net worth in 1942 and 1943 for payments of $10,000 which he received in each of those years from the Harrison and State Building Corporation. His position in substance is that such payments were made upon the mortgage notes held by him, that they merely reduced his investment, and that therefore his increase in net worth for those years must be reduced by the amount of those pay-meats. If such payments were in fact distributions of capital by the corporation, petitioner’s position would be correct. The parties did indeed stipulate orally at the trial that payments in those amounts were made on the mortgages, but the Government made it clear that it was not conceding that such payments had the legal effect of being merely a return of capital. And we are satisfied on the evidence that they did not in fact constitute a return of capital. The evidence is clear that petitioner had not made any loans to the building corporation, and that the mortgages had been executed in his favor, not as security for any loans, but merely to protect his interest in the corporation. Petitioner himself made it plain that these mortgages did not represent any indebtedness to him, and he characterized them as “funny mortgages, just for the business sake.” The corporation never declared any dividends as such, and it is obvious that the payments in controversy represented in effect merely distributions of corporate profits.[5] They must therefore be treated as dividends as a matter of law, regardless of the form in which they were cast. Accordingly, we cannot accept petitioner’s position that the payments which he thus received must be subtracted from his increase in net worth. A like contention is made by petitioner in relation to the net excess withdrawals in 1937 and 1938 from the 2126 South Wabash Restaurant Corporation. Similarly, we think that such withdrawals did not decrease his investment in that corporation. Colosimo’s was a large, successful establishment. We have found that its records were inadequate and a correct determination of income could not be made therefrom. We have found that on occasions the cash register did not accurately reflect the gross receipts. We think, therefore, that withdrawals from that corporation were withdrawals of earnings, and that petitioner is not entitled to have them treated as capital payments. 5. The Commissioner has determined that a part of the deficiency for each of the taxable years was due to fraud with intent to evade tax. We think that such fraud has been proved by clear and convincing evidence. There were substantial amounts of unreported income during the period in controversy, indicating a consistent intention to evade tax. Potson was less than frank with the agents when they asked for a statement of net worth. His efforts to explain the failings of the statement were lame indeed and are not worthy of belief. He had been found guilty of the crime of willfully attempting to defeat and evade a part of the income tax due and owing from him for the years 1940 to 1943, inclusive.[6] These considerations are merely illustrative, and, on the basis of the entire record, we have concluded that the Commissioner has sustained his burden of proving that a part of the deficiency for each of the taxable years is due to fraud with intent to evade tax.[7] Accordingly, because of such fraud, petitioner is not entitled to the benefits of section 6 of the Current Tax Payment Act of 1943. Decision will he entered under Bule 50. No adjustments are required for deductible expenditures. While it is true that such expenditures reflect additional resources available to the taxpayer during the period which would augment his gross income, the fact that they are deductible would neutralize their effect in determining the taxpayer’s net income. The burden of proof was, of course, upon the petitioner to show that the basic deficiencies determine'’ by the respondent, except for the 2 years not covered by waivers, were erroneous. Cf. Louis Halle, 7 T. C. 245, affirmed, 175 F. 2d 500 (C. A. 2), certiorari denied, 338 U. S. 949. The burden was on the respondent to prove fraud for all the years in controversy. On one occasion during the hearing when Rose Potson was on the stand, nine series of questions and answers were read to her and she was asked whether such questions had been put to her by the investigating agent and whether she gave such answers. 'In some instances she denied both that she had been asked the questions and had given the answers ; in other instances she denied only giving the answers. The agent was later called as a witness and testified that he had put the questions to her and that she had given the answers as read. We are fully satisfied that the agent told the truth and that Rose Potson lied. This was only one of a number of instances in the record casting doubt upon her credibility. Such admissions were made at the prior criminal trial and in the net worth statement filed by him with the California Bank. The face amount of the bonds registered in petitioner’s name and in the name of his wife was very close to the amount stated by petitioner in such prior admissions. The returns filed on behalf of the corporation disclosed an “earned surplus” of over $10,000 in 1942 and $16,000 in 1943. This does not necessarily preclude the existence of earnings and profits sufficient to support dividend distributions in the amounts in question. Petitioner made no effort to show that the earnings and profits of the corporation were insufficient for that purpose. Almost the entire transcript of that trial was Introduced in evidence in this proceeding as a joint exhibit. Since we have found fraud for the taxable years 1936 and 1937, the period of limitations for those years has not expired. Sec. 276, I. R. C.