C. C. GUNN, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 15673.

United States Court of Appeals
Eighth Circuit.

Aug. 8, 1957.

1288

Owen C. Pearce, Fort Smith, Ark. (Bethell & Pearce, Fort Smith, Ark., and Ralph W. Robinson, Van Buren, Ark., on the brief), for petitioner.

Sheldon I. Fink, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson, and S. Dee Hanson, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before GARDNER, Chief Judge, JOHNSEN, Circuit Judge, and DONOVAN, District Judge.

JOHNSEN, Circuit Judge.

A decision of the Tax Court (not officially reported), which redetermined deficiencies in income taxes for the years 1942–1946 and upheld fraud penalties for the years 1942–1944, is before us for review, on petition of the taxpayer. The tax deficiencies were in the amount of $55,562.15 and the fraud penalties in the amount of $27,715.99.

The primary contention urged here is that the Tax Court erred in crediting and adopting the Commissioner's computations of income based on a use of the net worth method, because the technique employed by the revenue agents in the situation had lacked, as to its starting assets figure, a fair investigation and realistic recognition of such amount of cash as petitioner had on hand.

The revenue agents had fixed a net worth figure of $5,895.94 for petitioner, as of January 1, 1942, the starting date for their deficiency computations. The only assets which they had credited petitioner with possessing at that time were a piece of real estate worth $1,000 and the motor equipment appearing on his business records.

Petitioner was engaged in the produce business at Van Buren, Arkansas, buying fruits and vegetables from farmers and selling them to canneries. His activities extended into several states, and during 1941, for the close of which the opening net-worth figure was established, he had been using at least 5 trucks and 2 trailers in his operations. His business regularly had its peak in the summer, but some form of produce was handled throughout the year. Thus, the month of December ordinarily was one of spinach activity.

The bookkeeper for the business (whose employment had begun, however, subsequent to 1941), as well as petitioner, testified that it was necessary and customary for petitioner to keep a substantial amount of cash in the office or on his person at all times, in order to operate the business. In sending out trucks to make itinerant purchases of produce from farmers, the drivers had to be provided with cash for this purpose, as well as cash for their expenses. The records of the business indicated with consistent regularity that many purchases of produce had been made for cash instead of by check, and apparently where the purchases were of small quantities, whether occurring at the plant or in the field, invoices had not been made up for them. And in making rejection of petitioner's records as being too incomplete, the revenue agents relied in part upon instances of checks which they discovered had been received from sales and cashed by petitioner, without having been deposited in his bank account.

The revenue agents' interest in these incidents primarily lay, of course, in the fact that petitioner's records failed to show such checks. No suggestion seems

to have occurred to them, as a prompting for further inquiry on whether the practice, beyond its evidencing of incorrect income return or evasion, could also be corroborative of petitioner's claim of carrying generally a substantial amount of cash on hand, as related to the question of what assets he had, particularly on January 1, 1942.

There was testimony by petitioner's bookkeeper that cash in the amount of $2500 to $5000 was regularly kept on hand in the office, during the time of her employment. The local banker testified that he knew that petitioner, through the course of his operations, "always carried considerable cash"; that this fact was a matter of common knowledge and repute in the community; and that such a practice was a general and recognized one on the part of truckers who, like petitioner, conducted their business by going out among farmers to purchase produce. A certified public accountant, employed by petitioner after the investigation of the revenue agents began (the tax situation has dragged through 10 years of time, from the commencement of the investigation, until the Tax Court's decision), undertook to prepare a balance sheet or schedule from a detailed audit and reconstruction of petitioner's transactions, in which he arrived at a result of cash and other assets, as of December 31, 1941, substantially beyond the revenue agents' only two items, of real estate and motor equipment.

The schedule was a matter of reconstruction, so that absoluteness or exactness could not be claimed for it, but it at least suggested some natural likelihoods for the Tax Court's consideration, as related to the revenue agents' meager result, in the accountant's attempted portrayal, "in accordance with accepted accounting principles", of the financial status of petitioner's business which, as of December 31, 1941, had had an existence of 7 years; which had made returns of net income for the preceding four years of over $41,000; which manifestly, from the elements shown by the record, was one of numerous transactions and

growing activity; and which did not appear to have been at any time operating under any financial stringencies or difficulties.

The explanation in the record, on the part of the revenue agent who had fixed petitioner's assets as a $1,000 piece of real estate and his motor equipment, of why he gave no consideration to the matter of any operating cash or capital, was as follows: "If Mr. Gunn (petitioner) kept on hand substantial amounts of cash he had no record of it. I don't know whether or not he did. I have never heard anyone say he did. I never noticed workers come in and get checks cashed while we were investigating this case". And further, "Neither (petitioner) nor (his certified public accountant) gave me any leads to investigate or told me about assets or liabilities which I had not included in net worth, and they did not tell me that Mr. Gunn had substantial amounts of cash other than in his bank accounts". The revenue agent had, however, been furnished with copies of the auditing and reconstruction schedules thereafter prepared by petitioner's public accountant and had engaged in discussions of them with the accountant prior to the hearing before the Tax Court, including the making of objections to a number of items, which the accountant readily accepted, in the hope of getting the whole situation peaceably adjusted.

On the hearing before the Tax Court, the Commissioner pointed to some circumstances as tending to justify and bolster the revenue agent's asset-and-net-worth figures, the chief of which were that petitioner had no cash balance in his bank account on December 31, 1941, and that he had made a number of borrowings from the bank during the years 1939–1942.

The Tax Court, in adopting the revenue agent's net worth determinations, both as to the starting date of December 31, 1941, and for the taxable years involved predicated thereon, said: "The parties * * * disagree as to petitioner's net worth immediately prior to

the taxable period, the starting point from which the increases in his net worth over the years in question could be computed. * * * There was general testimony to the effect that petitioner had substantial amounts of cash on hand that he used in his business. However, there was no showing with any specification as to how much money petitioner had, nor, more important, whether the money was derived from money or assets that petitioner had prior to the taxable period. The inference we draw from the testimony about petitioner's carrying substantial cash amounts on his person, was that they were business receipts that were used to carry on cash transactions in the business. In the light of the informal way that petitioner kept his books, this seems to us a more plausible inference than that such funds were derived from assets had prior to the taxable period. Further, respondent has shown that between February 1939 and January 2, 1942 petitioner made seven bank loans varying in amounts between $400 and $1200. While these borrowings in the period immediately prior to the years in question do not necessarily preclude petitioner's having money on hand at the same time, they at least lay the burden on petitioner of proving with more definiteness than he has done here, that he actually had the claimed amounts of cash on hand, and when he had these amounts."

 In general, for tax-liability purposes, the law accords to all determinations of fact by the Commissioner, whether express or necessarily implied, a presumption of correctness, which the taxpayer has the burden of overcoming before the Tax Court. And this presumption has application to determinations of opening net worth, made as a basis for arriving at subsequent tax deficiencies through that method, in situations where the technique is entitled to be employed. But in undertaking to set up such an opening net worth, the Commissioner owes the duty to the taxpayer of approaching the problem fairly and open-mindedly, as a question of getting at business or economic reality, regardless of the fact that the taxpayer may be a revenue delinquent, and not as a matter of refusing to give consideration to anything except such elements as technically satisfy his standards for acceptance in the searches made by him for revenue deficiencies generally.

The responsibility of getting at an opening net-worth figure, where the Commissioner has elected to use that alternate method in searching for a tax liability, is more than just a matter of adopting some ordinary deficiency assumption or premise. Opening net worth is not itself a tax source but constitutes an outside fact or base entirely, from which to commence a search for tax liabilities from other years. Hence it is that the fixing of an opening net-worth figure is a matter of getting at actual economic fact, and of not allowing reality to be obscured by engaging solely in a rigid tax-incident glance. And it is for this reason that the question of its fairness or correctness should not too loosely be allowed to be brushed under the rug of Commissioner presumption.

The attack which frequently has been leveled against the Commissioner's opening net-worth determinations is their failure to deal realistically with the question of claimed cash or working-funds assets. Many of these claims by taxpayers have been too wholly fanciful and tenuous to impress with any serious substance. But the fancifulness and tenuousness of such claims have also probably tended to a light treatment of the question of cash assets in other situations, without regard to apparent economic realities and persuasive commercial implications, unless the taxpayer has been able, by records or otherwise, to make definitive and inescapable demonstration.

Thus, in Potson v. Commissioner, 22 T.C. 912, affirmed sub nom. Bodoglau v. Commissioner, 7 Cir., 230 F.2d 336, where the Commissioner had recognized the petitioner, a large operator of the Chicago underworld, as having cash assets, for net-worth purposes, of only

$15.03 as of December 31, 1935, whereas the petitioner claimed to have had over $200,000, the Tax Court itself said that, while there was some support in the record for the Commissioner's position, "we are convinced by other evidence that the Commissioner's position is unrealistic", as against the facts that the petitioner "had been engaged in illegal activities on an extensive scale"; that he "operated a thriving night club business"; and that there "was considerable evidence that he had available substantial amounts of cash during this period". 22 T.C. at pages 928 and 929. The Tax Court refused to credit petitioner's own testimony that he had over $200,000 in cash, but it undertook to exercise its "best judgment, based on a study of all the evidence", and concluded that there had existed cash in the sum of $100,000, which the taxpayer was entitled to have included in the opening net worth used for tax-liability purposes. The Court of Appeals for the 7th Circuit approved the Tax Court's action and determination, although it commented that "We think the Tax Court was generous to taxpayer in fixing $100,-000 as the amount of cash on hand at the beginning of the net worth period". 230 F.2d at page 340.

In Thomas v. Commissioner, 1 Cir., 232 F.2d 520, where the Tax Court had sustained the Commissioner's determination of deficiencies, based upon an opening net-worth figure which did not recognize the petitioner as having had any cash on hand, the Court of Appeals for the 1st Circuit reversed and said: "The presumption which favors the determinations of the Commissioner is not to be regarded as meaning that any arbitrary figure assigned to the cash on hand account without support in the record must nonetheless be treated as conclusive in the absence of an affirmative showing by the taxpayer of the correct amount." 232 F.2d at page 524. The opinion pointed out that the circumstances relied upon by the Commissioner, and accepted by the Tax Court, to support the net-worth determination made, with its lack of recognition of any cash on hand—cir-cumstances of the same general char-acter as those relied upon here—were "primarily negative in character" in that, while they might "tend to prove that the taxpayer had no large hoard of cash", they would "seem to be completely ineffective to establish that he had no cash at all". 232 F.2d at page 525.

The Court went on to state that the Tax Court could, of course, properly refuse to find that the taxpayer had cash on hand in the amount of $22,000, as claimed by him, "But we believe that the Tax Court was clearly in error when it found that the taxpayer did not have $5,800, or $2,700, or, in fact, any cash on hand at all as of the * * * date". 232 F.2d at page 525. It added this concluding observation: "If respondent (Commissioner) is to be permitted to make an arbitrary guess as to the proper figure for the cash on hand account, there would seem to be no reason as a general proposition why similar guesses should not be made as to each of the constituent elements comprising the taxpayers' net worth. Under these circumstances the entire net worth technique becomes nothing but an elaborate accounting sham lending a semblance of system and logic to a determination of deficiency which could have no greater validity than the original guesswork upon which it was based." 232 F.2d at page 526. See also Estate of Phillips v. Commissioner, 5 Cir., 246 F.2d 209.

In Marcella v. Commissioner, 8 Cir., 222 F.2d 878, 883, where the Commissioner had used the "excess cash expenditures method" in determining a deficiency for the year 1947, this Court held that the Commissioner was warranted "in discarding the taxpayer's records and making a determination of tax liability by an approved alternate method", but that the Tax Court's upholding of the determination made was not entitled to stand, because the Commissioner had not given proper consideration to the sources and amount of cash which the taxpayer had available to him at the commencement of the taxable year.

The opinion stated: "The taxpayer did much of his business on a cash basis. He handled the cash personally, sometimes in considerable amounts. Much of it never reached his bank account. * * * The taxpayer contended that he had $8,500 in cash money on hand at the start of 1947. * * * The examiner gave the taxpayer no credit for any cash money available at the start of 1947, giving as a reason that he was not able to determine the amount. * * * We find no justifiable basis for the Tax Court's failure to consider the $17,490.71 increase in bank loans as a source of cash available to the taxpayer. * * * Apparently what the Commissioner did and what the Tax Court approved was to strike a balance between non-business available cash and personal expenditures, and call the difference taxable income, disregarding completely any sources of nontaxable cash available from the business enterprise. The taxpayer was entitled to have nontaxable cash available from his business added to the sources of cash available with which he was credited. * * * Since neither the Commissioner nor the Tax Court gave consideration to sources of nontaxable cash available to the taxpayer from his substantial business interests, the deficiency determination made by the Tax Court is clearly erroneous * * *." 222 F.2d at pages 883, 885.

In the present situation, it seems to us that the Commissioner and the Tax Court have failed to give consideration, in connection with petitioner's claim, to the natural business facts of petitioner's situation and their ordinary economic implications and realities. As has been pointed out, petitioner's business had a previous history of 7 years of substantial and increasing operations. There was nothing to indicate that it had ever been in any financial difficulties. To the contrary, the record suggests that it constituted a stable and growing business. The products in which it dealt were purchased in numerous transactions and from varied sources. It engaged in buying produce wherever this could be found, either in small or large amounts, paying for a substantial number of the purchases in cash. Many of its sales checks petitioner cashed, without depositing the money in his bank account. Despite this, the deposits made in his bank account during the year 1940 had exceeded $75,-000. The only outstanding debt which the business had, according to the schedule set up by the revenue agent, in his net worth basis for December 31, 1941, was a short-term borrowing from the bank in the amount of $1200.75.

To say in these circumstances, and in the face of the profitable nature of the business which the revenue agent was claiming for the tax years immediately following, that the enterprise should be regarded as having had no accumulated cash or existing working capital on hand with which to carry on its activities generally, or even as a culminating result of its operations for the year 1941, which the Commissioner treated as having involved a cleaning up of all its sales transactions, and with no accounts receivable outstanding, seems to us such a mathematical artificiality and so unrealistic as a general or business fact, as definitely and firmly to convince of error in the deficiency determinations which the Commissioner and the Tax Court made for the years 1942, 1943 and 1944, predicated upon the opening net-worth figure used.

We do not believe that the Tax Court could warrantedly hold that the facts and circumstances which we have mentioned were entitled to be entirely disregarded and that it would be plausible to conclude instead that the business, notwithstanding its growth, scope and profit, was merely a hand-to-mouth operation, which had been able to be successfully conducted through a merry-go-round racing of cash between sales and purchases, but for which a vacuum of cash or working funds had somehow come to exist on December 31, 1941, so that the business stood on that date with a complete zero, not only of inventory and of accounts receivable, but also of any cash on hand, either previously existing or derived from the year's operations, with

which it would be able to commence its 1942 operations.

On the record before us, the decision of the Tax Court, for lack of realistic consideration and evaluation as discussed above, is reversed as to the redeterminations of deficiencies, made by it for the years 1942, 1943 and 1944, predicated upon the net-worth figure used by it for December 31, 1941, and as to the penalties dependent thereon for their amounts. The parties should on further hearing or proceedings be given the opportunity to introduce any additional evidence available to them, in respect to petitioner's net worth on December 31, 1941, and to any other element relating to the amounts of the deficiencies for the three years mentioned.

It should be added that, while petitioner thus is being accorded the privilege of introducing further evidence generally on his 1942, 1943 and 1944 tax liability, because of the reversal required from the unrealisticness on the present record of the zero-cash determination made as to the opening net worth, the situation is one in which otherwise the decision of the Tax Court in its various aspects would have been permitted by us to stand.

 Petitioner's records were shown to have been so incomplete in their reflection of income as properly to entitle the revenue agents to resort to the net worth method for arriving at its amount. Cf. Thomas v. Commissioner, 6 Cir., 223 F.2d 83, 86; Marcella v. Commissioner, 8 Cir., 222 F.2d 878, 881. And the circumstances found to exist as to the manner in which petitioner had carried on his transactions, failed to make entries in his books, withheld cash from his bank account, made deposits of cash in the names of other persons, failed to file timely income tax returns during earlier years, made amended returns when the investigation began, etc., adequately sustain the Commissioner's burden on the question, and warrant the imposing, of fraud penalties in the situation.

 The question of whether there had been fraud with intent to evade taxes, under 26 U.S.C.A., Int.Rev.Code of 1939, § 293(b), was one of fact for the Tax Court on the elements as a whole, of the circumstances, conduct and incidents related to the taxpayer's business and attendant upon his tax returns, and one which we are not entitled to disturb, where, as here, it rests on clear and convincing evidence. 10 Mertens Law of Federal Income Taxation § 55.11.

The claim of error in the alleged hearsay testimony of a revenue agent as to what the records of some of petitioner's customers showed is not one of such permeating substance in the situation as would of itself entitle petitioner to a reversal. The matter is in any event one that can, and we assume will, be handled by an appropriate stipulation on the further hearing.

As to the deficiency determinations for the years 1945 and 1946 (no fraud penalties are involved as to these two years), which are without relationship to the opening net worth figure of December 31, 1941, the decision of the Tax Court is entitled to be affirmed. The question as to these two years was whether petitioner had engaged in a sharing of his income with his wife, which he should properly have returned as his own. As to the year 1945, the record is clear that he had merely assigned to his wife part of the income from his business, which had been produced by him, and had her make return of it in her name for tax purposes.

 As to the year 1946, after his 1945 income-sharing had been challenged, petitioner executed a written partnership agreement with his wife, and made payment for her of the amount of her purported capital contribution of $15,000. The Tax Court regarded the fact of the agreement and petitioner's testimony, that such a partnership actually existed, as unpersuasive against the lack of any evidence "of the extent to which the agreement's terms were actually carried out", and of any showing "of the extent of petitioner's wife's participation in the business, except a passing reference to her helping out in the office at busy times, or of whether she actually controlled her

share of partnership income". This evaluation cannot be declared by us to be clearly erroneous. Cf. Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 742, 69 S.Ct. 1210, 1214, 93 L.Ed. 1659; Kasper v. Baron, 8 Cir., 207 F.2d 744.

The rest of petitioner's contentions call for no consideration.

For the reasons stated, the Tax Court's decision as related to the taxable years 1942–1944 is reversed, with remand for further proceedings, and the decision as related to the taxable years 1945–1946 is affirmed.

Affirmed in part, reversed in part.