ARC REALTY COMPANY, a corporation, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

ARCADIA REALTY COMPANY, a corporation, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

LYDIADE INVESTMENT TRUST, a corporation, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Nos. 16722, 16725; 16723, 16726; 16724, 16727.

United States Court of Appeals Eighth Circuit.

Oct. 17, 1961.

Rehearing Denied Nov. 14, 1961, in Nos. 16722 to 16726.

G. A. Buder, Jr., St. Louis, Mo., made argument for petitioner.

Carolyn R. Just, Atty., Dept. of Justice, Washington, D. C., made argument for respondent; Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson, and A. F. Prescott, Dept. of Justice, Washington, D. C., on the brief.

Before SANBORN, MATTHES, and RIDGE, Circuit Judges.

MATTHES, Circuit Judge.

These cases, consolidated for trial in the Tax Court and here, involve three personal holding companies, Arc Realty Company, Arcadia Realty Company, and Lydiade Investment Trust, all Missouri corporations, and are before us on petitions for review of the decisions of the Tax Court. Substantial deficiencies in income tax and personal holding company surtax for the years 1951 through 1954 were assessed by the Commissioner and sustained by the Tax Court, as shown by findings of fact and opinion reported at 34 T.C. 484.

Four issues are presented for determination: (1) whether the Tax Court correctly sustained the determination that for purpose of ascertaining gain on certain stock the basis therefor was $20 per share; (2) whether the petitioners are entitled to deduct under § 505(a) (1) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 505(a) (1), in computation of the personal holding company Subchapter A net income for taxable years 1951, 1952 and 1953, federal income taxes paid during the years which had accrued and been deducted in prior years; (3) whether the Tax Court correctly sustained the Commissioner's computation of the tax of petitioner Arc Realty Company for 1953; (4) whether the Tax Court should have permitted petitioners to offer additional evidence concerning unused dividends paid credit carryovers.

### Issue 1.

With the exception of two witnesses who testified as experts, the facts were stipulated and so found by the Tax Court. Inasmuch as the parties are familiar with the factual background, which appears for others interested in 34 T.C. 484, we shall not here indulge in full repetition of the details. In summary, it was established that on June 21, 1932, petitioners held 5% gold notes of American Press, the owner of a St. Louis, Missouri newspaper, with total face values as follows: Arc $180,000; Arcadia $125,000; and Lydiade $100,000; and on June 24, 1932, surrendered the notes and received in exchange interim certificates for shares of 4% second preferred stock of Star-Chronicle Publishing Company as follows: Arc 630 shares, Arcadia 437½ shares, and Lydiade 350 shares. Between 1932 and 1934, G. A. Buder, an officer and principal shareholder in Arc, Arcadia, and Lydiade, transferred interim certificates for 1,104 shares of the 4% second preferred stock of Star to Lydiade as a contribution to capital. Eight hundred fifty of these shares were a part of the 875 shares which he acquired on June 24, 1932, in exchange for American Press 5% gold notes having a face value of $175,000. On July 2, 1934, Star issued stock certificates for 4% second preferred stock to petitioners in amounts equal to the interim certificates held by each.[1]

During the year 1951, and pursuant to redemption call for shares of the 4% second preferred stock of Star, each of the petitioners received $100 per share for the following amounts of such stock held by them:

|  | No. of Shares | Amount Received |
| --- | --- | --- |
| Arc | 630 | $63,000 |
| Arcadia | 437½ | 43,750 |
| Lydiade | 1473 | 147,300[2] |

In their income tax returns for 1951, filed on cash basis, petitioners reported the basis of the 4% second preferred stock to be $100 a share, and that, therefore, no gain or loss was realized. In due time the Commissioner made the deter-

---

[1]. The issuance of the interim certificates, their deposit in escrow and the issuance of the second preferred stock, were in accordance with terms and provisions of the purchase and sales agreement between American Press as seller and Star-Chronicle Publishing Company as purchaser, pertinent provisions of which appear in the Tax Court opinion.

[2]. As we have seen, Lydiade acquired 350 interim certificates on June 24, 1932, and between 1932 and 1934 it acquired 1,104 interim certificates from G. A. Buder. During 1935 and 1936 Lydiade purchased 19 shares of the 4% second preferred stock of Star for $680, with the result that in 1953, when the stock was called, it owned 1,473 shares.

mination which provoked this litigation, that is, that 2,521½ shares of the 2,540½ shares possessed a fair market value on the date acquired by petitioners of $20 a share; and that the basis for the 19 shares purchased by Lydiade in 1935 and 1936 was the cost thereof, or $35.79 per share. This determination is not in dispute.

Petitioners press the contention that when the interim certificates were acquired by them and for which they received certificates for 2,521½ shares of the second preferred stock, the interim certificates had no fair market value and that their cost basis must be determined by resort to one of two suggested methods: (A) using the value of the consideration given for the stock; (B) considering the amount of the debt discharged by receipt of stock.

■ Realistically, what petitioners contend for in both (A) and (B) is that, irrespective of the cost, if any, to them of the surrendered notes, the face amount thereof controls for the purpose of resolving the instant question.[3] We find no support in legal authority or in logic for this argument. It has been held, and properly so, that the face amount of the surrendered notes does not establish prima facie the cost thereof to petitioners. Skinner et al. v. Eaton, D.C.Conn., 34 F.2d 576, affirmed 2 Cir., 44 F.2d 1020. Where there is no proof as to the cost of notes or other assets surrendered for stock which is the subject of capital gains treatment, the rule contended for could conceivably produce manifest unfairness and unjust result.

■ Section 111, Internal Revenue Code of 1939, 26 U.S.C.A. § 111, provides that "(t)he gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 113(b) for determining gain * * *." Section 113(b) of the Code, 26 U.S.C.A. § 113(b), which deals with the adjusted basis for determining gain and the man-

ner in which such gain shall be determined does not expressly or impliedly authorize a taxpayer to ascertain capital gains by using the face amount of surrendered notes as the cost basis to him for the property received in exchange therefor. In such a situation if the stock forming the basis for the capital gains treatment had an ascertainable fair market value when acquired in satisfaction of the indebtedness represented by the notes surrendered, the taxpayer is deemed to have collected the debt evidenced by the face amount of the surrendered notes only to the extent of the fair market value of the stock received by the taxpayer, and the basis of such stock to him thereafter is the fair market value when initially received. See Society Brand Clothes, Inc. v. Commissioner, 18 T.C. 304. In this setting, the crucial questions are: (1) did the Star preferred stock surrendered in 1951 have a fair market value so as to afford a cost basis; (2) if so, was the determination of $20 per share correct? Since these are basically factual questions, we resort to firmly established legal principles. For tax-liability purposes, determinations of fact by the Commissioner, whether express or necessarily implied, are presumptively correct, and the taxpayer has the burden of overcoming the determinations before the Tax Court. Gunn v. Commissioner of Internal Revenue, 8 Cir., 247 F.2d 359; Crown Iron Works Co. v. Commissioner of Internal Revenue, 8 Cir., 245 F.2d 357; Paster v. Commissioner of Internal Revenue, 8 Cir., 245 F.2d 381, certiorari denied 355 U.S. 876, 78 S.Ct. 139, 2 L.Ed. 2d 107; Weiss v. Commissioner of Internal Revenue, 8 Cir., 221 F.2d 152; Heiner v. Gwinner, 3 Cir., 114 F.2d 723, certiorari denied Gwinner v. Heiner, 311 U.S. 714, 61 S.Ct. 396, 85 L.Ed. 465. Such a presumption may be rebutted and will support a finding in favor of the Commissioner only in the absence of substantial evidence to the contrary. Wiget v. Becker, 8 Cir., 84 F.2d 706; Cullers v. Commissioner of Internal Revenue, 8

---

3. For reasons not made clear by the record, petitioners failed to offer evidence as to the cost to them of the surrendered gold notes.

Cir., 237 F.2d 611, 614. We do not retry the case and substitute our judgment for that of the Tax Court, and if that Court's finding is supported by substantial evidence upon the record as a whole, and is not against the clear weight of the evidence or induced by an erroneous view of the law, it cannot be disturbed upon appeal. Sachs v. Commissioner of Internal Revenue, 8 Cir., 277 F.2d 879, certiorari denied 364 U.S. 833, 81 S.Ct. 63, 5 L.Ed. 2d 59.

" 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, rehearing denied 333 U.S. 869, 68 S.Ct. 788, 92 L.Ed. 1147." Sachs v. Commissioner of Internal Revenue, 8 Cir., 277 F.2d 879, 881, and cases cited.

The main thrust of petitioners' argument is: a) that the interim certificates were deposited in escrow and so held for a period of two years; b) that the corporation issuing the same was a closed corporation; c) that there was no public distribution of the stock; and d) that under the purchase and sale agreement between American Press and Star-Chronicle Publishing Company, the issuance of the 4% shares in lieu of the interim certificates was contingent upon the satisfactory performance of certain acts in the future, and that these factors and others considered in totality, effectively prevented the securities from having a fair market value in June, 1932. This argument overlooks factors which justified a contrary finding. The certificates had an intrinsic value, indeed, petitioners assert that the capital structure of Star was such that the *actual* value of the second

preferred stock, when the interim certificates were issued, was in excess of $100 a share; the parties to the transaction apparently contemplated the interim certificates would be dealt in and transferred as the purchase and sale agreement referred to the certificates as "assignable interim certificates" and the certificates themselves contained provisions for assignment. Mr. Buder did in fact assign a substantial number of shares between 1932 and 1934 and in September, 1932, a creditor of American Press surrendered promissory notes in exchange for interim certificates. We do not regard the provisions of the purchase and sale agreement as being so restrictive as to completely destroy the market value of the certificates, as was true in Helvering v. Tex-Penn Oil Co., 3 Cir., 300 U.S. 481, 499, 57 S.Ct. 569, 81 L.Ed. 755; [4] neither were holders of the certificates prevented by the agreement from selling them as in MacDonald v. Commissioner of Internal Revenue, 7 Cir., 230 F.2d 534, nor restricted as to sale thereof for a period of years as was the situation in Propper et al. v. Commissioner of Internal Revenue, 2 Cir., 89 F.2d 617.

■■ In our view, the escrow agreement was designed to assure that the seller's shareholders had approved the sale and that the property conveyed was free of all encumbrances. Necessarily, a purchaser of the interim certificates acquired them subject to the conditions and restrictions of the agreement. However, the existence of the restrictions does not *ipso facto* lead to the conclusion that the stock had no fair market value. Heiner v. Gwinner, 3 Cir., 114 F.2d 723, 725, certiorari denied Gwinner v. Heiner, 311 U.S. 714, 61 S.Ct. 396, 85 L.Ed. 465; Kline v. Commissioner of Internal Revenue, 3 Cir., 130 F.2d 742, 744, certiorari denied 317 U.S. 697, 63 S.Ct. 440, 87 L.Ed. 558. In Trinity Corporation v. Com-

---

4. In this case the Supreme Court was of the *opinion that* " * * * in the peculiar circumstances of this case, the shares of Transcontinental stock, regard being had to their highly speculative quality and to the terms of a restrictive agreement making a sale thereof impossible, did not have a fair market value, capable of being ascertained with reasonable certainty." 300 U.S. at page 499, 57 S.Ct. at page 577.

missioner of Internal Revenue, 5 Cir., 127 F.2d 604, 605, certiorari denied 317 U.S. 651, 63 S.Ct. 47, 87 L.Ed. 524, where the stock involved had been pledged to secure performance of a contractual obligation, the court stated:

> "However, the sale of the stock was not forbidden by the agreement; the sole effect of the restriction imposed was that a purchaser would take subject to the terms of the agreement. Such a restriction may reduce, but does not destroy, the fair market value."

Petitioners make much of the testimony of their two expert witnesses who expressed an opinion that the interim certificates were not marketable. Admittedly the experts based their opinion on an examination of the terms and conditions of the purchase and sale agreement without an examination of the records of the corporations or the capital structure of the corporation issuing the certificates. We are not persuaded to hold that this testimony conclusively settled the question. The rule is well recognized that the trier of the facts, here the Tax Court, determines the weight to be given expert testimony. Gloyd v. Commissioner of Internal Revenue, 8 Cir., 63 F.2d 649; Cullers v. Commissioner of Internal Revenue, 8 Cir., 237 F.2d 611; Sisto Financial Corporation v. Commissioner of Internal Revenue, 2 Cir., 149 F.2d 268; Kline v. Commissioner of Internal Revenue, 3 Cir., 130 F.2d 742, certiorari denied 317 U.S. 697, 63 S.Ct. 440, 87 L.Ed. 558. While we recognize that evidence of competent and impartial expert witnesses should not be arbitrarily disregarded, Fitts' Estate v. Commissioner of Internal Revenue, 8 Cir., 237 F.2d 729, 732, on this record we have no difficulty in reaching the conclusion that the Tax Court did not act arbitrarily in failing to adopt the position advocated by the experts.

The question of "fair market value," defined to be "the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy nor to sell and both being informed," O'Malley v. Ames, 8 Cir., 197 F.2d 256, at page 257; Fitts' Estate v. Commissioner of Internal Revenue, 8 Cir., 237 F.2d 729, 731, is one of fact and cannot be established on the basis of fixed rules or formulae. Among the factors properly to be considered in making the determination are corporate assets, earnings, dividend policy, earning power of the corporation, prospects of the corporation, book value, character of the management, competition and other factors which an informed purchaser and informed seller would take into account. O'Malley v. Ames, supra; Fitts' Estate v. Commissioner of Internal Revenue, supra.

To give a detailed résumé and analysis of the facts for the purpose of demonstrating that the instant determination is invulnerable to a successful attack would unduly and unnecessarily prolong this opinion. It is sufficient to say that consideration of such factors as the earnings of Star, its dividend paying record, its physical assets, capital structure and other pertinent matters satisfies us that a factual basis exists which warranted the Commissioner in the first instance and the Tax Court as the trier of the facts in arriving at the cost basis of $20 per share. The matter of fixing the fair market value of corporate stock for capital gains treatment, with numerous factors entering the picture, obviously cannot be accomplished with exactness or complete accuracy. The agency or tribunal making the determination must exercise sound discretion and good judgment within the framework of proper legal standards. We might have arrived at a different value if we had been making the determination in the first instance, but as the late Judge Learned Hand very appropriately stated in Sisto Financial Corporation v. Commissioner of Internal Revenue, 2 Cir., 149 F.2d 268, 269, "our powers of review are very straitly limited upon all issues of fact, * * * and that limitation is particularly narrow when the issue is one of value."

Concluding as we do that the determination of $20 per share must stand, it is unnecessary to give further consideration to petitioners' alternative contention that if the interim certificates had a fair market value when issued it was equal to at least $100 per share.

### Issue 2.

Petitioners urge that in the computation of their personal holding company Subchapter A net income, they were entitled to deduct federal income taxes paid during the years which had accrued and been deducted in prior years. The Tax Court sustained the Commissioner in disallowing this method of computation.

Subchapter A is a part of Chapter 2, which in addition to the taxes imposed by Chapter 1, imposes a surtax upon the undistributed Subchapter A net income of every personal holding company. Section 505 of the 1939 Code provides:

"For the purposes of this subchapter the term 'Subchapter A Net Income' means the net income with the following adjustments:

"(a) Additional deductions. There shall be allowed as deductions—

"(1) Federal income, war-profits, and excess-profits taxes *paid or accrued* during the taxable year to the extent not allowed as a deduction under section 23; * * *." (Emphasis supplied.)

As shown in the margin,[5] petitioners, in computation of their Subchapter A net

| 5. | Arc | Arcadia | Lydiade |
|---|---|---|---|
| 1950 income tax paid in 1951 ............. | $2,700.37 | $ 647.79 | $ 860.26 |
| 1951 income tax accrued but not paid in 1951 .............................. | 3,667.25 | 4,935.12 | 1,062.39 |
| Total .......................... | $6,367.62 | $ 5,582.91 | $1,922.65 |
| 1951 income tax paid in 1952 ............. | $3,667.25 | $ 4,935.12 | $1,062.39 |
| 1952 income tax accrued but not paid in 1952 .............................. | 2,876.52 | 6,992.22 | 639.73 |
| Total .......................... | $6,543.77 | $11,927.34 | $1,702.12 |
| 1952 income tax paid in 1953 ............. | $2,876.52 | $ 6,992.52* | |
| 1953 income tax accrued but not paid in 1953 .............................. | 5,095.66 | 1,647.87 | |
| Total .......................... | $7,972.18 | $ 8,641.39 . | |

Petitioners further claimed as deductions on their personal holding company surtax returns payments of deficiencies in income taxes allowed by the Commissioner as deductions in prior years as follows:

| | Arc | Arcadia |
|---|---|---|
| 1952 return: 1945, and 1946 deficiencies allowed by Commissioner as deductions in computing 1945, 1946 surtax, but not paid by petitioners until 1952 ...... | | $1,119.47 |
| 1953 return: 1947, and 1948 deficiencies allowed by Commissioner as deductions in computing 1947, 1948 surtax, but not paid by petitioners until 1953 ...... | $461.15 | 360.56 |
| 1953 return: 1949, and 1950 deficiencies allowed by Commissioner as deductions in computing 1949, 1950 surtax, but not paid by petitioners until 1953 ...... | 23.08 | |

The total deductions for income tax disallowed by the Commissioner are:

| | Arc | Arcadia | Lydiade |
|---|---|---|---|
| 1951 ........................ | $2,700.37 | $ 647.79 | $ 860.26 |
| 1952 ........................ | 3,667.25 | 6,054.59 | 1,062.39 |
| 1953 ........................ | 3,360.75 | 7,353.08 | |

* Petitioners showed $6,992.52 as 1952 income tax rather than $6,992.22.

income for taxable years 1951, 1952 and 1953, deducted federal income taxes paid during said years although accrued and deducted in prior years. The Tax Court sustained the Commissioner's disallowance of the claimed deductions on the theory that the amounts disallowed represented double deductions.

Petitioners' reliance on Birmingham et al. v. Loetscher Co., 8 Cir., 188 F.2d 78, and De Soto Securities Company v. Commissioner of Internal Revenue, 7 Cir., 235 F.2d 409, is misplaced. These and other cases [6] have interpreted the meaning of the words "paid or accrued" under distinguishable factual situations. But we do not regard Birmingham, supra, and De Soto Securities Company, supra, or any other case as standing for the proposition that a taxpayer, for personal holding company tax purposes, may take a double deduction, i. e., deduct the amount of its income tax both in the year incurred and in the year paid.

### Issue 3.

The question presented here is whether the Commissioner, who was sustained by the Tax Court, properly determined the taxes owed by Arc Realty Company for the year 1953. The dispute arises out of the proper interpretation of the alternative tax as applied to personal holding companies. Section 117(c) of the 1939 Code, 26 U.S.C.A. § 117(c), provides:

"(c) Alternative taxes.

"(1) Corporations. If for any taxable year the net long-term capital gain of any corporation exceeds the net short-term capital loss, there shall be levied, collected, and paid, in lieu of the tax imposed by sections 13, 14, 15, 204, 207(a) (1) or (3), 421, and 500, a tax determined as follows, if and only if such tax is

less than the tax imposed by such sections:

"(A) A partial tax shall first be computed upon the net income reduced by the amount of such excess, at the rates and in the manner as if this subsection had not been enacted.

"(B) There shall then be ascertained an amount equal to 25 per centum of such excess, except that in the case of any taxable year beginning after March 31, 1951, and before April 1, 1954, there shall be ascertained an amount equal to 26 per centum of such excess.

"(C) The total tax shall be the partial tax computed under subparagraph (A) plus the amount computed under subparagraph (B)."

Section 13 imposes the normal corporate income tax and § 500 imposes a surtax on personal holding companies. Both sections were applicable to this petitioner.

In determining Arc's tax liability for 1953 the Commissioner imposed a tax at the normal rates under § 13. This tax was on total taxable income including the excess of net long-term capital gains over net short-term capital losses. In determining Arc's personal holding surtax under § 500, the Commissioner used the method set out in § 117(c), i. e., he determined the surtax on § 500 income after subtracting the excess of net long-term capital gains over net short-term capital losses and added to this 26% of this excess. At this point the capital gains had been taxed at the full rate under § 13 and at the 26% rate under § 117(c). Since § 117(c) only allows a tax of 26% on capital gains when the alternative method is used, the Commissioner then subtracted the amount of the tax under § 13 applicable to capital gains. He determined this amount by calculating the percentage of the excess of capital gains to total net

6. In Birmingham, supra, and in other cases, Commissioner of Internal Revenue v. Clarion Oil Co., 80 U.S.App.D.C. 41, 148 F.2d 671, certiorari denied 325 U.S. 881, 65 S.Ct. 1575, 89 L.Ed. 1997; Aramo-Stiftung v. Commissioner of Internal Revenue, 2 Cir., 172 F.2d 896;

Patten Fine Papers, Inc. v. Commissioner of Internal Revenue, 7 Cir., 249 F.2d 776, the question was whether a taxpayer on cash basis could deduct the amount of income tax liability in the year paid, or in the year in respect of which the tax liability was incurred.

income and multiplied the amount of the § 13 tax by this percentage. This method was approved by the Tax Court in The Clarence Co. v. Commissioner, 21 T.C. 615. To summarize, the Commissioner found the total tax liability for 1953 to be the normal tax under § 13 plus the alternative tax for § 500 minus the portion of § 13 tax attributable to the excess of the net long-term capital gains over the net short-term capital losses.

The effect of the Commissioner's method is to interpret § 117(c) to mean that the alternative tax should be applied *separately* in the determination of the tax for §§ 13 and 500. Under this method, the alternative § 117(c) tax was not less than the § 13 tax, consequently the Commissioner refused to allow the alternative tax in lieu of the § 13 tax.[7] This interpretation by the Commissioner requires a determination that § 117(c) imposes several alternative taxes. We fail to find support for the Commissioner's approach in the words of § 117(c) or in the cases interpreting this section. In Woodbury Farms & Realty Corporation v. United States, 278 F.2d 333, the Court of Claims faced the problem of determining the deductibility of certain taxes by a personal holding company. In order to decide this question the court had to determine the proper application of the alternative tax to personal holding companies. The position of the Commissioner in that case was the same as here. In a well reasoned opinion the court pointed out that § 117(c) imposes *an alternative* tax in lieu of the taxes imposed by the enumerated *sections* and therefore imposes one tax only. The holding in the Woodbury case was adopted August 4, 1960 by the Internal Revenue Service in Revenue Ruling 60–285.[8]

In another case concerning the deductibility of taxes the Third Circuit was faced with the question of the application of the alternative tax to personal holding companies. Delaware Realty & Investment Co. v. Commissioner of Internal Revenue, 234 F.2d 911. There the Court pointed out that § 117(c) clearly imposes a tax *in lieu of all other taxes*, and concluded the test for the applicability of § 117(c) should be whether or not the tax imposed by § 117(c) is less than the *aggregate* of the taxes imposed by the other sections. Delaware Realty & Investment Co. v. Commissioner of Internal Revenue, supra, at page 914. The Tax Court distinguished the Delaware case from the facts before us by stating that in the Delaware case the taxpayer's net income did not exceed the excess capital gains. While this is a factual difference, it does not affect the interpretation of § 117(c) made by the Court in Delaware. We are convinced the courts in the Woodbury and Delaware cases reached the proper result in interpreting § 117(c). We conclude the tax of a personal holding company having an excess of capital gains should be determined as follows: (1) apply § 117(c) (1) (A) and compute the partial tax for §§ 13, 15[9] and 500 excluding the excess of net long-term capital gains over the net short-term capital losses; (2) apply § 117(c) (1) (B) and add to the taxes determined in (1) 26% of the excess of net long-term capital gains over the net short-term capital losses. If this sum is less than the taxes imposed by §§ 13, 15 and 500, the taxpayer is entitled to the alternative tax.

It may be argued this results in a boon to personal holding companies with large capital gains. Nevertheless, the language of the Code cannot be ignored.[10]

---

7. In order for the alternative tax to be used, it must result in a tax lower than the normal tax. See § 117(c) set out above.

8. The Commissioner failed to call this case or ruling to our attention.

9. Section 15 imposes a surtax on "corporation surtax net income" in excess

of $25,000 and was not applicable to this taxpayer.

10. In amending the Code in 1954 Congress eliminated the personal holding company surtax from the alternative tax section so that advantages, if any, which may have resulted in favor of personal holding companies under § 117(c) of the 1939

Arc's application of § 117(c) also was incorrect. It properly determined that for 1953 it was not liable for a § 13 "partial tax" under § 117(c) (1) (A) because after subtracting excess capital gains and allowable credits no taxable income remained. But it then erroneously concluded that its sole tax was 26% of the excess of capital gains, thus failing to include in its calculation the amount of § 500 "partial tax," required by § 117 (c) (1) (A).

### Issue 4.

One of the issues presented to the Tax Court by petitions for redetermination was the disallowance by the Commissioner of alleged unused dividends paid credit carryovers from prior taxable years in the computation of personal holding company surtax. Petitioners did not choose to present any evidence to the Tax Court to sustain their position on this issue, but asserted that the question involved solely a matter of computation which depended upon other issues which the Tax Court was required to determine.

Following the Tax Court's opinion in which attention was directed to the failure to present evidence to establish that the dividends paid in 1950 exceeded Subchapter A net income for the same year, petitioners, in their alternative motion for a further trial, stated that petitioner Lydiade Investment Trust had failed to offer such evidence because of "inadvertent oversight, and that it desires an opportunity to show and prove that according to respondent's own determination the dividends paid by it in the taxable year 1950 exceeded its Sub-Chapter A net income for the same year by the sum of $2,281.44." Petitioner Lydiade Investment Trust now asserts as error the Tax Court's denial of this request. This assignment is without merit.

A motion to reopen the case and hear further evidence is addressed to the sound discretion of the Tax Court, and a denial of such motion will not be reversed on appeal in the absence of extraordinary circumstances. Scott v. Commissioner of Internal Revenue, 8 Cir., 117 F.2d 36, 40; Francis Edward McGillick Foundation v. Commissioner of Internal Revenue, 3 Cir., 278 F.2d 643, 649; cf. Bankers' Pocahontas Coal Co. v. Burnet, 287 U.S. 308, 312, 313, 53 S.Ct. 150, 77 L.Ed. 325. This record is devoid of a showing of abuse of discretion in the denial of the motion, indeed, Lydiade Investment Trust failed to demonstrate in the Tax Court that a further hearing would have changed the result in any respect.[11]

The decision of the Tax Court is affirmed as to Issues 1, 2 and 4, and is reversed as to Issue 3 for the purpose of recomputation of the tax liability of petitioner Arc Realty Company for 1953 consistent with our views expressed on that issue.

---

Code, will not again occur. See 26 U.S. C.A. § 1201.

11. Stock Yards Nat. Bank of South St. Paul v. Commissioner of Internal Revenue, 8 Cir., 153 F.2d 708, 712, relied on

by Lydiade is inapposite. There Commissioner's determination was induced by a clear mistake of law, which in the opinion of this Court, called for a further hearing.