Marie H. HAMM, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

William HAMM, Jr., Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Nos. 17121, 17122.

United States Court of Appeals
Eighth Circuit.

Dec. 30, 1963.

tice, Washington, D. C., on the brief, for respondent.

Before SANBORN and BLACKMUN, Circuit Judges, and STEPHENSON, District Judge.

BLACKMUN, Circuit Judge.

The Tax Court has upheld asserted deficiencies in the 1953 federal gift taxes of Marie H. Hamm and William Hamm, Jr., in the respective amounts of $317,281.96 and $456,138.53. Judge Pierce's opinion, 79 pages in length and not reviewed by the full court, is T. C. Memo 1961–347. Each taxpayer has petitioned for review.

The Hamms are husband and wife and residents of Minnesota. Each filed a timely gift tax return for 1953. By these returns they consented, as § 1000(f) of the Internal Revenue Code of 1939 permitted, that gifts made by either of them to third persons during the year might be considered as having been made one-half by each.

The reported 1953 gifts were made by Mr. Hamm to two trusts created under separate declarations executed by him on July 18 of that year. The first gift to each trust consisted of $40,000 in cash at its inception. The second gift to each trust was made on December 30, 1953; it consisted of 130 shares, for one trust, and 133⅓ shares, for the other trust, of common stock of United Properties, Incorporated. This stock was valued at $100 per share in Mr. Hamm's return. The division of the gifts between husband and wife; the assertion, under § 1004(a) (2) (B), of deductions for a claimed charitable portion of the gifts; and the taking into account of net gifts made in prior tax years, resulted in the payment of 1953 gift taxes upon the returns as filed of approximately $8,600 for Mrs. Hamm and $13,200 for Mr. Hamm.

The substantial deficiencies upheld by the Tax Court are attributable (a) to the upward adjustment of the value of the United common from the returned figure of $100 per share to $8,506.40 per share

Joseph A. Maun, of Maun, Hazel, Green, Hayes, Simon & Aretz, St. Paul, Minn., Lawrence J. Hayes, St. Paul, Minn., on the brief, for petitioners.

Ralph A. Muoio, Attorney, Department of Justice, Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen., Tax Division, Washington, D. C., John B. Jones, Jr., Lee A. Jackson, Donald P. Horwitz, Attorneys, Department of Justice, Washington, D. C., on the brief, for respondent.

and (b) to the disallowance of the deductions for the claimed charitable portions.

The charitable feature is not in contest on this review so we are confronted with only the valuation issue. As a consequence, the provisions of the trust instruments are of no great import here. It suffices merely to say that the declaration for the one trust provides that net income until March 1, 1964, is to be paid to The Hamm Foundation, Inc.; that from March 1, 1964, through 1969, net income is to be accumulated; and that on January 1, 1970, the trust corpus and the accumulations are to be distributed to the taxpayers' son Edward, if living, or, if not, to issue or other named alternate beneficiaries. The declaration for the second trust contains parallel provisions except that the taxpayers' son William is the principal individual beneficiary.

United is a Minnesota corporation organized in December 1937. Shareholders of Theo. Hamm Brewing Company, Saint Paul, caused United to be formed so that it could hold real estate and other property formerly held by the brewing company. Later United acquired additional real estate and other interests.

At all times from its inception and through 1953, United's issued and outstanding stock consisted of 1,000 common shares and 35,000 cumulative preferred shares. Each class had a $100 par value. Neither was listed on any stock exchange or traded over the counter. No sale of United stock was effected prior to the trial.

When United was formed both its common and preferred shares were issued two-fifths to Mr. Hamm and one-fifth to each of his three sisters. By December 1953 the holdings of United's stock had become more diversified in the sense that some shares were then held by children and trustees. The 2-1-1-1 ratio as between family branches, however, remained. The December gifts by Mr. Hamm did not change this family ratio although they eliminated his personal holding of common.

United's directors for the five years preceding the gifts consisted of Mr. Hamm, the husbands of two of the sisters, and the taxpayers' attorney; its officers were the same two brothers-in-law, the attorney, and two others.

United's articles provide that its voting power is vested solely in the common; that holders of the preferred have no right to vote for any purpose; that the preferred is entitled to semi-annual dividends of 3½% which are cumulative without interest; that no dividend on common may be paid until all delinquent dividends on preferred have been paid; that in the event of liquidation holders of preferred have preference over common shareholders to the extent of the preferred's par value plus all unpaid dividends; and that any or all of the outstanding preferred is redeemable at any time at the option of the directors at $105 per share plus accumulated dividends.

The amount necessary to satisfy the annual dividend requirement on the preferred is $245,000. Some preferred dividends, always less than this annual requirement, were paid by United through its fiscal year 1941 but none was paid thereafter. As of December 31, 1953, the accumulated and unpaid preferred dividends were $3,685,500. No dividend was ever paid on the common.

On the date of the gifts United held either title or long term leases for 68 parcels of real estate, most of which were improved properties located in the City of Saint Paul. It also then held all or substantially all the shares of 8 corporations with businesses located in or near Saint Paul. Two of these were each the parent of a wholly owned subsidiary. United also held cash, marketable securities, notes, contracts, and mortgages receivable, interests in oil and gas properties, and other assets. Its operations consisted primarily of holding and managing its real properties, holding the shares of its subsidiaries and its oil and gas interests and other properties, and receiving the rents, dividends and other income from these investments. It did.

not manufacture or produce any product. It did not act as a dealer in real estate, securities, or other property. It seldom sold any investment.

The Tax Court found that United's underlying net assets had a fair market value on the date of the gifts of $18,870,456. *This finding is not challenged by the taxpayers here.* The details of this computation of underlying asset value are set forth at length in the Tax Court's opinion and they need not be repeated here.

From this underlying net asset value figure the Tax Court deducted a total of $7,185,500, consisting of $3,500,000 for the par value of the outstanding 35,000 preferred shares plus the $3,685,500 preferred dividend arrearages. This left $11,684,956 as that portion of the underlying net asset value allocable to the 1,000 shares of outstanding common, or $11,684.96 for each common share.

It will be observed that the Tax Court, in determining the capital amount attributable to the preferred, did not include an additional $5 per share for the premium required if the preferred were to be redeemed. If this $5 increment, or $175,000, were taken into account, then the computation results in an underlying net asset value of the $11,509.96 ($11,684.96 less $175) allocable to each share of common.

As stated above, the Commissioner in his statutory notice of deficiency had determined that the value of the gift common was $8,506.40 per share. The Tax Court, obviously directing itself to this determination by the Commissioner, and in view of its finding of underlying net asset value per share of common, made an ultimate finding that the value of the gift common "was, at the time of the gifts, not less than $8,506.40 per share" and held that the taxpayers had failed to establish error as to this determination of value.

The taxpayers emphasize that the gifts were minority interests in the voting stock and that the usual problems incident to the valuation of a minority inter-est in a closely held corporation are made even more complicated here by (1) the nature of the underlying assets, viz., a large number of real estate parcels concentrated in one area and stocks of wholly owned subsidiaries which also have never been the subject of a sale; (2) the existence of the preferred and its substantial dividend arrearages; and (3) United's obligations under long term leases for a total rent liability in excess of $24,000,000, the existence of which renders liquidation impossible. The taxpayers then raise four points: (1) that the Tax Court failed to find the facts specially and to state separately its conclusions of law thereon; (2) that it failed to make any finding as to the actual market value of United Common; (3) that it failed to make any finding as to the value of a minority interest in the United Common; and (4) that the evidence compelled a finding that the market value of a minority interest in that stock was $735 per share.

Before discussing these points we note the principles, most of them well established, to which the parties refer. A presumption of correctness attends the Commissioner's deficiency determination and, apart from fraud, the taxpayers have the burden of showing it to be incorrect. Wickwire v. Reinecke, 275 U.S. 101, 105, 48 S.Ct. 43, 72 L.Ed. 184 (1927); Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933). The clearly erroneous standard applies to findings made by the Tax Court. Idol v. Commissioner, 319 F.2d 647, 651 (8 Cir.1963). When a gift is made in property its value at the date of the gift governs for gift tax purposes. Section 1005 of the 1939 Code. For stocks this value is fair market value. Regulations 108, § 86.19. "Fair market value is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy nor to sell and both being informed". O'Malley v. Ames, 197 F.2d 256, 257 (8 Cir. 1952); Arc Realty Co. v. Commissioner, 295 F.2d 98, 103

(8 Cir. 1961). Valuation of stock for tax purposes is a matter of "pure fact". Penn v. Commissioner, 219 F.2d 18, 20–21 (9 Cir. 1955); Arc Realty Co. v. Commissioner, supra, p. 103 of 295 F.2d; Gamble v. Commissioner, 101 F.2d 565, 567 (6 Cir. 1939), cert. denied 306 U.S. 664, 59 S.Ct. 790, 83 L.Ed. 1061. And it "is ever one of fact and not of formula". In re Nathan's Estate, 166 F.2d 422, 425 (9 Cir. 1948); Collins v. Commissioner, 216 F.2d 519, 522 (1 Cir. 1954); Snyder's Estate v. United States, 285 F.2d 857, 861 (4 Cir. 1961). The "absence of market price is no barrier to valuation". Guggenheim v. Rasquin, 312 U.S. 254, 258, 61 S.Ct. 507, 509, 85 L.Ed. 813 (1941); Whitlow v. Commissioner, 82 F.2d 569, 574 (8 Cir. 1936).

■■ The Tax Court is the trier of the facts, the judge of the credibility of witnesses and of the weight of the evidence, and the drawer of appropriate inferences. Commissioner v. Scottish American Investment Co., 323 U.S. 119, 123–125, 65 S.Ct. 169, 89 L.Ed. 113 (1944); Helvering v. National Grocery Co., 304 U.S. 282, 294, 58 S.Ct. 932, 82 L.Ed. 1346 (1938). An appellate court's powers of review are limited "and that limitation is particularly narrow when the issue is one of value". Sisto Financial Corp. v. Commissioner, 149 F.2d 268, 269 (2 Cir. 1945); Arc Realty Co. v. Commissioner, supra, p. 103 of 295 F.2d.

Many relevant factors in the determination of value are listed in Mertens, Law of Federal Income Taxation, Volume 10, § 59.21. Pertinent factors have been noted by this court in Fitts' Estate v. Commissioner, 237 F.2d 729, 731–732 (8 Cir. 1956), in Arc Realty Co. v. Commissioner, supra, p. 103 of 295 F.2d, and in O'Malley v. Ames, supra, p. 258 of 197 F.2d. One might say in general that these factors are the things that a buyer and a seller would wish to know and consider before reaching a conclusion as to fair value. This court has said that "there is no single formula universally applicable in determining such value and in the absence of evidence of an open market for stock it is proper to consider all the circumstances connected with the corporation in determining its fair market value". O'Malley v. Ames, supra, p. 258 of 197 F.2d.

Section 7459(b) of the Internal Revenue Code of 1954, applicable here (see § 7851(a) (6) (C) (iv) of that Code), places upon the Tax Court the duty to make written findings of fact. Section 7482(a) and Rule 52(a), F.R.Civ.P., require that the Tax Court "find the facts specially". Commissioner v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed. 2d 1218 (1960); Loco Realty Co. v. Commissioner, 306 F.2d 207, 209 (8 Cir. 1962).

In addition to these settled legal principles there are elements in this case which, after a careful review of the stipulated facts, the many exhibits, and the fairly voluminous and technical record, impress us initially and appear to have pertinence generally to the points raised by the taxpayers. These elements are: (1) United common's underlying asset value being in excess of $11,500 per share, whether the $5 call price increment is utilized or ignored; (2) the taxpayers' concession of the validity of this underlying asset figure; (3) the substantial difference of $3,178.56 (or $3,003.56) per common share, amounting to approximately 27%, between this underlying asset figure and the determined value figure of $8,506.40; (4) the impressive list of factors taken into consideration by the Tax Court [1] in making its ultimate find-

---

1. In its opinion the Tax Court said:
"We have, in making said ultimate finding as to value, carefully considered all the evidence pertaining to the present issue, including the stipulations of fact, the testimony of all witnesses presented by each of the parties, and the numerous exhibits received in evidence which included area maps, corporate records, financial statements and other data pertaining to the problem before us. We also have analyzed all said evidence, and given due weight to each item or portion thereof. Most of the facts established by the evidence have hereinabove been set forth in considerable detail in our Findings of Fact; and, while we believe that no useful purpose would be served by

ing of value and in weighing the value opinions expressed by the several expert witnesses; and (5) the realization that the four points raised by the taxpayers are essentially interrelated.

With this as background, we consider the four points:

1. Finding the facts specially. The taxpayers argue that "substantial evidence" as to value was submitted by both parties; that because of this any presumption of correctness of the Commissioner's deficiency determination passed from the case; that there is no way of ascertaining how the Tax Court arrived at its value determination; that although the court listed in general terms several factors it said it had taken into consideration, it cannot be determined what weight it gave to any of these; that this strikingly contrasts with its valuation findings as to the underlying assets; that the importance of this contrast is evidenced by the discovery of the "$175,-000 error" as to the call premium, a discovery made possible because the court detailed its method of valuing the underlying assets; that the court's failure deprives the taxpayers of the right to know if there has been a judicial review of the Commissioner's administrative determination; that an approach based on underlying asset value, when appropriately discounted, produces a result less than the Commissioner's figure; that one based on price-earnings ratios on consolidated 5-year average earnings or on 1953 earnings produces a result out of line with those prevailing for leading American companies; and that the court

making an extended review of the same here, we state that among the factors or elements of value to which we have given consideration, are the following: The organization and history of United Properties, Inc.; its capital structure, the nature of its business, and the manner in which such business was operated; the number of outstanding shares of each class of the company's capital stock, and the identity of the shareholders; the number of shares transferred in making each of the gifts here involved; the fact that United's shares were not listed on any exchange, were not dealt in

did not find the facts specially but pronounced a conclusion and nothing more. A number of cases are cited where valuation details and weighting factors are apparent from the opinions.

This argument is all very well so far as it goes. It is fundamentally, however, an argument for the trier of fact and not one for a reviewing court. It overlooks the fact, although it almost concedes it, that the voluminous record before us does contain material which affords adequate support to the Tax Court's determination of value. As is mentioned more than once in this opinion, underlying net asset value is not contested here and exceeds $11,500 per common share. There is testimony that the current assets alone yielded a net value of almost $7,000. There is opinion testimony that future earnings would approximate from $400 to $500 per common share. The Commissioner's expert testified that in his opinion the fair market value of a share of United common on December 31, 1953, was $9,000 and that he had given serious consideration to a value of $9,500 but had recognized that he was concerned with a minority interest. This evidence alone, and without further comment, justifies the Tax Court's arrival at a value of $8,-506.40 per share.

It is true that the record contains nothing pinned to this exact dollar and cents figure. However, it is well settled that "Valuation * * * is necessarily an approximation * * *. It is not necessary that the value arrived at by the trial court be a figure as to which

through brokers or in over-the-counter trading, and had not been the subject of any sales; the character and amounts of United's assets and liabilities; the fair market value of its underlying assets; the amounts and trends of its annual earnings, and the prospects for future earnings; its dividend paying history, and the prospects for future dividend payments; and all other factors which, in our view or that of the witnesses, tend to have an effect on the value of the shares of stock here involved, on the material valuation date."

there is specific testimony, if it is within the range of figures that may properly be deduced from the evidence". Anderson v. Commissioner, 250 F.2d 242, 249 (5 Cir. 1957), cert. denied 356 U.S. 950; Alvary v. United States, 302 F.2d 790, 795 (2 Cir. 1962); Webster Investors, Inc. v. Commissioner, 291 F.2d 192, 194 (2 Cir. 1962); Commissioner v. Thompson, 222 F.2d 893, 895 (3 Cir. 1955); Gloyd v. Commissioner, 63 F.2d 649, 652 (8 Cir. 1933), cert. denied 290 U.S. 633, 54 S.Ct. 52, 78 L.Ed. 551; Mertens, Law of Federal Income Taxation, Volume 10, § 59.03 (1963 cumulative supplement). Such is the situation here.

The valuation of closely held stock is basically a question of judgment rather than of mathematics. We feel that the taxpayers' argument here comes down to a demand for a formula. Formulas, however, are only tools. With the kind of evidence present here, we need not, and do not, go so far as to require that a detailed computation leading to the determined value be present in the Tax Court's findings.

2. The finding as to market value. The taxpayers argue that the only valuation finding made by the Tax Court was that the United common was "not less than $8,506.40 per share"; that this is only a general statement; and that it constitutes no finding at all and is meaningless.

As the taxpayers point out, there are cases which have been remanded because the Tax Court's findings "were not sufficiently definitive", see Showell v. Commissioner, 238 F.2d 148, 153 (9 Cir. 1956), or because approximations generally discussed did not "reveal the arithmetic employed by the court in reaching its final figure", see Cohen v. Commissioner, 266 F.2d 5, 12 (9 Cir. 1959). Compare the opinion of four justices in Commissioner v. Duberstein, supra, pp. 292–293 of 363 U.S. pp. 1200–1201 of 80 S.Ct., 4 L.Ed.2d 1218.

In the setting of this case, however, the taxpayers' argument and their reliance on Showell and Cohen are not convincing. The Tax Court's determination here, as a practical matter, certainly equates with a finding that the value of the stock was the stated figure and not ungently hints that the taxpayers might well consider themselves fortunate that it was not higher. An identical finding was upheld in Richardson v. Commissioner, 151 F.2d 102, 104–105 (2 Cir. 1945), cert. denied 326 U.S. 796, 66 S.Ct. 490, 90 L.Ed. 485, although one judge expressed doubt about the actual evaluation standard employed in that case. Somewhat similar language was involved and also upheld in Gross v. Commissioner, 92 F.2d 621, 622 (7 Cir. 1937), although the court there felt that it was confronted with "a rather awkward expression". See, also, Baker v. Commissioner, 115 F.2d 987, 989 (6 Cir. 1940).

Cohen is a different kind of case for there the Commissioner's original deficiency determination was "shown to be invalid". Consequently, the presumption of its correctness had been destroyed and the Commissioner, rather than the taxpayer, had "the burden of proving whether any deficiency exists and if so the amount", p. 11 of 266 F.2d. See Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935). Thus the Tax Court itself had redetermined the deficiency. In the Hamm case here, on the other hand, the figure is well within the range of values which find support in the testimony. The same distinction exists as to Gersten v. Commissioner, 267 F.2d 195 (9 Cir. 1959), urgently pressed upon us by the taxpayers. While there is language in that opinion which is understandably seized upon by the taxpayers here, it seems to us that the core of the holding is that the Tax Court's result rested on nothing more than sheer speculation. The case was therefore remanded "to permit the taking of further testimony to determine whether any fair market value can be found", p. 199 of 267 F.2d.

In summary, then, we think the Tax Court's finding here, although phrased in "not less than" language, possessed sufficient definiteness to meet the requirements of § 7459(b) and Rule 52

(a), to advise and inform the taxpayers appropriately, and to constitute an acceptable finding as to value.

3. The finding as to the value of a minority interest. Here the taxpayers assert that if the Tax Court made any finding of market value of United common it was one which related only to the value of all the common and was not a determination as to the minority interests here involved. There is no merit in this contention. The court's ultimate finding was as to "The fair market value of the 263⅓ shares of common capital stock of United Properties, Inc., which were transferred by gift * * * ". This language is repeated in the opinion section of its decision. The material quoted in our footnote above contains specific references to capital structure, outstanding shares, and the number of shares transferred by these gifts. If, in view of the over-all complete ownership of the common by the Hamm family, this minority interest point has any real validity, the foregoing convincingly demonstrates that the minority interest aspect was considered by the court and that its determination was made as to that specific interest.

4. The $735 per share figure. The taxpayers argue here that, because of the staggering amount of United's total contractual liability under its long term leases, liquidation was impossible as a practical matter; that to a minority shareholder liquidating value and net value of underlying assets were meaningless and of no importance; that the only things of significance to him were earnings and dividend paying capacity; that valuation on the basis of present worth of future earnings is valid; and that $735 a share, the highest possible value testified to by any witness for the taxpayer, was the valuation to be found for United common.

This narrow approach, based on future earnings and dividends, would exclude any consideration of underlying asset value. It was rejected by the Tax Court as not furnishing "a reliable criteria of

the value of the shares of stock here involved".

Here again the taxpayers' argument is one more appropriately addressed to the trier of fact than to us. It did not sell itself to the Tax Court. Future earnings and dividend prospects are not the only factors having recognizable validity. United was a family company. Its history demonstrates that it was not managed with a view to dividends. Long range appreciation, inflation hedging, and other investment considerations all seem to have been inherent in its policy. As an appellate court we cannot say that the underlying asset value is without significance. The average small investor on the street might not be attracted to United stock because of the family control and other features but an investor with knowledge, acumen, and substantial capital might be. The absence of dividends, the presence of arrearages, and the existence of sizable rental obligations over the long term are not conclusive factors in view of the nature of this corporation and of its ownership.

We therefore hold that the Tax Court's conclusion that earnings alone are not a reliable criterion of value was not improper and that its consideration of underlying asset value and of factors other than earnings and dividend prospects was justified. This is a situation where it is clearly for the Tax Court to decide the weight to be given to various factors. In re Nathan's Estate, supra, p. 427 of 166 F.2d; Bank of California National Ass'n v. Commissioner, 133 F.2d 428, 432 (9 Cir. 1943). The Tax Court was not compelled to accept the evidence of the taxpayers' experts as to values. "It is within its province to accept such evidence in toto, in part, or not at all. Its weight is with the trial Board, and its worth is for its sound judgment to determine. It is not required to surrender its judgment to the judgment of experts". Gloyd v. Commissioner, supra, p. 650 of 63 F.2d; Fitts' Estate v. Commissioner, supra, p. 733 of 237 F.2d. We like and agree with

Judge Fee's comments in Penn v. Commissioner, supra, p. 21 of 219 F.2d:

> "There was no need to state the process by which valuation was attained except to make clear that all appropriate factors required by law to be taken into consideration were in fact weighed. As has been seen, [the Tax Court] stated the rule admirably and correctly. If improper weight may have been given to these elements of evaluation but the conclusion was not demonstrably wrong, an appellate court should not interfere. Congress has committed questions such as valuation to the Tax Court. This Court claims no competency in evaluation of stock or in the field of corporate accounting."

What was said there is applicable here. Affirmed.