UNITED STATES of America,
Plaintiff-Appellee,

v.

Andrew GARGUILO,
Defendant-Appellant.

No. 929, Docket 76–1596.

United States Court of Appeals,
Second Circuit.

Argued March 17, 1977.

Decided May 3, 1977.

Robert E. Lindsay, Atty., Tax Div., Dept. of Justice, Washington, D.C. (Myron C. Baum, Acting Asst. Atty. Gen., Gilbert E. Andrews and Richard B. Buhrman, Attys., Tax Div., Dept. of Justice, Washington, D.C. and David G. Trager, U. S. Atty., E.D.N.Y., Brooklyn, N.Y., on the brief), for plaintiff-appellee.

Joel A. Brenner, New York City (James M. LaRossa, New York City, on the brief), for defendant-appellant.

Before LUMBARD and TIMBERS, Circuit Judges, and DAVIS, Judge, Court of Claims.*

LUMBARD, Circuit Judge:

Andrew Garguilo appeals from judgment entered on December 10, 1976 by Judge Pratt in the Eastern District after convictions by a jury on two counts of wilful failure to file income tax returns for the years 1969 and 1972, 26 U.S.C. § 7203. Appellant's principal claims are that evidence on his income in 1969 and 1972 was insufficient to support convictions, that there was a variance between indictment and proof, and that the court erred in admitting into evidence estimates of gross income and tax liability made by a government expert. Finding no merit to the appeal, we affirm.

Appellant and his brother Anthony Garguilo were tried jointly for conspiracy to evade taxes, 18 U.S.C. § 371. Anthony was charged with having filed false personal income tax returns for 1970, 1971, and 1972, 26 U.S.C. § 7206(1), in which he failed to report income from his gambling business; for 1971, appellant was charged with the same crime as his brother. It was also charged that appellant had wilfully failed to file tax returns for the years 1969, 1970, and 1972, even though he had operated a gambling business that yielded sufficient income in those years to require the filing of a return, 26 U.S.C. § 7203.

At trial, several witnesses testified that they had participated in a regular weekly blackjack game with appellant at various times in 1970, 1971, and 1972. One witness testified that the game had begun in 1969. Originally, the game was held at the Brooklyn home of Benny Balsamo, the brother-in-law of appellant's wife. Appellant's brother Anthony was an occasional participant. Appellant often handed out the chips at the beginning of the evening and he or Balsamo would handle the settling up among the players at the end. On evenings when the game was full, a house cut would be taken from each pot and would range from $500 to $1500 per night; some of this went to pay for food and refreshments, waitresses, and dealers.

Balsamo died in May 1972, and later that year the game was moved to an apartment in Manhattan rented by appellant's brother Anthony. Several witnesses testified that a house take continued to be removed from each blackjack pot. Appellant handled much of the settling up of winnings and

---

* Hon. Oscar H. Davis, *Judge,* U.S. Court of     Claims, sitting by designation.

losses, which was conducted either. at the end of the evening or at a later date.

In addition, the government witnesses testified that appellant and his brother were involved in a sports bookmaking operation which handled bets of several hundred dollars on a regular basis. Wagers were placed by telephone to a "Mr. Wilson"; appellant and his brother would collect the losers' payments and pay out on winning bets.

One of the customers, Herbert Haskell, testified that by 1972 he owed $120,000 to the book. Haskell was a stockholder and chairman of the board of DJH Industries, a textile firm. To pay off his debt, he transferred 10,000 shares of DJH stock to the brothers in the summer of 1972, a 5000 share certificate to Andrew and a 5000 share certificate to Anthony. Haskell testified that the stock was restricted and also that he had the brothers sign an agreement not to sell it on the open market for two years. The market value of the stock at that time was $22 per share, but because of the nonnegotiability Haskell estimated that only 25 to 35 percent of his value was immediately realizable by the brothers.

The government also introduced proof that in 1969 appellant had an account with a stock brokerage firm and had realized $6219.69 in short-term capital gains. Checks totalling $26,000 were sent to him from the firm in June 1969.

An Internal Revenue Service representative testified that appellant submitted returns for 1966, 1967, 1968, and 1971, but none for 1969, 1970, or 1972.

Over defense objections, Irving Wax, an IRS agent, testified as an expert witness to estimates of appellant's income. Based on the testimony at trial Wax concluded that Andrew Garguilo had realized $16,219.69 in gross income in 1969 and $45,965 in 1972. These estimates were based on the $6219.69 in short-term capital gains in 1969, $27,500 for the value of the DJH stock received in 1972, one-half the approximate house cut

from the blackjack games in 1969 and 1972, and some other income from bookmaking in 1972. Without taking into account possible deductions, Wax calculated that appellant's tax liability would have been $3411.68 in 1969 and $13,638.20 in 1972.

The. defense contended that none of the alleged income was chargeable to the Garguilos. Balsamo's widow testified that the blackjack game and the bookmaking operation were her husband's. She said that the appellant, who was one of the regular blackjack players, sometimes helped out on nights when Balsamo was sick and sometimes made collections for Balsamo's bookmaking operation, and that Balsamo paid appellant small amounts for these services. She testified that in order to conceal income from his gambling operations Balsamo had used Garguilo as a nominee to buy and sell stock.

Mrs. Balsamo also testified that the blackjack game at her husband's home did not begin until March 1970 and it was played in a first-floor apartment that had previously been occupied by John Polizzi. Polizzi testified that he had lived in the apartment from October 1969 to March 1970 and that no blackjack had been played there during that time. Gas and telephone bills paid by Polizzi confirmed the dates of his occupancy. However, the prosecution pointed out that its witnesses had said only that the game was played at Balsamo's house, without making reference to any particular first-floor apartment. Neither defendant took the stand.

The jury acquitted on all counts except appellants' § 7203 violations for 1969 and 1972 (counts five and seven of the indictment).[1] Garguilo was sentenced to six months imprisonment on count five, fined $2500 on each count, and given six months suspended sentence and three years probation on count seven.

We find there was ample evidence to support both convictions. In 1969, appellant received $6219.69 in short-term capital

---

1. Appellant Andrew Garguilo was acquitted on three counts: the conspiracy to evade taxes,

the filing of a false return for 1971, and the failure to file a return for 1970.

gains on stock held in his name; this was well in excess of the $600 gross income minimum for filing a tax return for that year. When a taxpayer holds stock in his own name, he cannot complain if he is later unable to convince a jury that he was only a nominee for somebody else. The jury could also infer that appellant received a substantial share of the house take from the blackjack games in both 1969 and 1972. Proof of gross receipts was sufficient since evidence of "unexplained receipts shifts to the taxpayer the burden of coming forward with evidence as to the amount of offsetting expenses, if any." *Siravo v. United States,* 377 F.2d 469, 473–74 (1st Cir. 1967); cf. *United States v. Stayback,* 212 F.2d 313, 317 (3rd Cir. 1954); cert. denied, 348 U.S. 911, 75 S.Ct. 289, 99 L.Ed. 714 (1955); *United States v. Hornstein,* 176 F.2d 217, 220 (7th Cir. 1949). There was no evidence as to the amount of any blackjack expenses. In addition, there was the evidence that appellant had received approximately $27,000 worth of stock in 1972 as income from bookmaking—well in excess of the $2800 gross income minimum for filing a tax return for that year. In the absence of evidence of offsetting bookmaking expenses and losses, the jury could reasonably infer that the $27,000 in income was not fully offset. Relying on *Helvering v. Tex-Penn Co.,* 300 U.S. 481, 499, 57 S.Ct. 569, 81 L.Ed. 755 (1937), and *Propper v. Commissioner,* 89 F.2d 617 (2d Cir. 1937), appellant argues that the stock could not be income in 1972 because it was too heavily restricted. However, those cases do not abrogate the general proposition controlling here, which is that stock received by a taxpayer should be taxed in the year of receipt unless the stock has no substantial and reasonably ascertainable value at the time. See, e.g., *Arc Realty Co. v. Commissioner,* 295 F.2d 98, 102–03 (8th Cir. 1961); J. Mertens, The Law of Federal Income Taxation § 11.08 at 32 (rev. ed.1974). Thus, the evidence did support a finding that Garguilo received income in 1969 and 1972 which he was required to report.

The jury was properly instructed that a defendant's failure to file a return should be considered "wilful" if he acted "with the specific intent to fail to do what he knew the law requires to be done." See *United States v. Pomponio,* 429 U.S. 10, 97 S.Ct. 22, 50 L.Ed.2d 12 (1976); *United States v. Bishop,* 412 U.S. 346, 360, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973). Here it was relevant that appellant had filed returns in other years when he claimed refunds, and that there was substantial tax due for 1969 and 1972, see generally *Lumetta v. United States,* 362 F.2d 644, 645–46 (8th Cir. 1966). This was more than enough to establish wilfulness.

Appellant's claim of improper variance must be considered in the context of the trial. In the prosecutor's opening statement to the jury, he announced the government's intention to prove that appellant had derived income from a gambling partnership with his brother and had also received income in 1969 from various stock transactions. Testimony by the prosecution's witnesses, however, raised the possibility that appellant might have been an underling rather than a principal in the gambling operations. When the government introduced evidence of appellant's stock transactions in 1969, he made no objection as to the relevance of the capital gains. In fact, counsel explicitly conceded that the government had a right to prove short-term capital gains as part of appellant's 1969 income.

In moving to dismiss at the close of the government's case, defense counsel asserted that it would be an improper variance of the indictment for convictions to be allowed on the basis of income received by the defendants as employees rather than principals. Judge Pratt explicitly rejected this argument.

The defense then introduced the testimony by Mrs. Balsamo that appellant had been only an occasional minor employee in her husband's gambling business. This, of course, tended to undercut the government's claim that appellant and his brother had split all the house takes from the blackjack games between themselves. It

may ultimately have been responsible for brother Anthony's acquittal; since Anthony was rarely present at the blackjack games in 1969, 1970, and 1971, income could be imputed to him from the games in those years only on the assumption that he had been a partner with appellant. However, Mrs. Balsamo's testimony did confirm that appellant had indeed received some income from running the blackjack game; it remained for the jury to decide whether this income was substantial enough to require the filing of a tax return. The defense as to the 1969 capital gains was that these were attributable to Balsamo rather than to appellant.

At the close of trial, defense counsel again moved to dismiss. They also asked Judge Pratt to instruct the jury not to convict either defendant for failing to report monies earned as underlings in a gambling business owned by another person. Judge Pratt denied the motion to dismiss and the requested charge.

█ By failing to object to the introduction of the evidence on capital gains, by conceding that the capital gains could properly be used as proof of items of income in 1969, and by failing to argue to the trial judge that this constituted an impermissible variance of the indictment, appellant waived his right to raise that portion of his variance argument on appeal. As for the rest of his complaint, we do not find any variance in the fact that the government was not required to prove whether Garguilo was a principal of the gambling business. A material variance occurs only if "the

prosecutor has attempted to rely at the trial upon theories and evidence that were not 'fairly embraced in the charges made in the indictment.'" *United States v. Silverman,* 430 F.2d 106, 111 (2d Cir.), modified on other grounds, 439 F.2d 1198 (1970), cert. denied, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971), quoting *Russell v. United States,* 369 U.S. 749, 793, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962) (Harlan, *J.,* dissenting). See also *United States v. Ragen,* 314 U.S. 513, 526, 62 S.Ct. 374, 86 L.Ed. 383 (1942); *United States v. Burdick,* 221 F.2d 932, 934 (3d Cir. 1955). In this case each element of the crimes proved at trial was exactly as charged in the indictment: the wilful failure to file required tax returns in 1969 and 1972. The indictment here alleged that appellant had "operated a gambling business" from which he had earned income. The indictment did not say that he was a partner in the operation. It did not exclude the possibility that Garguilo could have operated the gambling business on behalf of somebody else. Nor could it have made any difference so long as it was shown that he received income from some participation in the running of the gambling business. Thus, it was not a material variance from the indictment for the government to prove that Garguilo had earned income by operating blackjack games and collecting bookmaking receipts for Balsamo.[2]

█ Appellant's other principal contention may be disposed of briefly. Although not challenging the propriety of the government's use of an expert witness for the purpose of summarizing the taxpayer's income, see generally *United States v. John-*

2. We do not agree that the Supreme Court's decision in *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), requires reversal in this case. In *Stirone* the Court held that where an indictment under the Hobbs Act, 18 U.S.C. § 1951, had charged the defendant with interfering with the interstate movement of sand into Pennsylvania, it was improper for the defendant to be convicted on evidence of an effect on steel shipments from Pennsylvania into Michigan and Kentucky. The Court reasoned that because interference with commerce was an essential element of the crime charged, a conviction on a theory not considered by the grand jury would deprive the felony defendant

of his fifth amendment right to indictment by a grand jury. See also *Russell v. United States, supra,* 369 U.S. at 770, 82 S.Ct. 1038; *Ex parte Bain,* 121 U.S. 1, 9–10, 7 S.Ct. 781, 30 L.Ed. 849 (1887).

As we have indicated above, we find no variance here under the *Stirone* standard. There is also a question, undecided in this circuit, whether *Stirone* governs in a misdemeanor case, where the fifth amendment right not to be tried except on charges brought by a grand jury is inapplicable. Compare *United States v. Goldstein,* 502 F.2d 526 (3d Cir. 1974) (en banc), with id. at 532–34 (Hunter, *J.,* dissenting).

*son,* 319 U.S. 503, 519–20, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943), appellant asserts that the witness Wax in this case made so many computational errors and false assumptions that his testimony should have been stricken. Where error is so pervasive in an expert's testimony as to render it useless, the court has discretion to order the testimony stricken so as to avoid undue confusion and prejudice. Cf. *United States v. Celetano,* 391 F.Supp. 1252 (S.D.N.Y.1975). In general, however, an expert's mistakes should affect only the weight of his testimony and not its admissibility. Here the district court's refusal to strike was clearly the proper course. Defense counsel made no effort to cross-examine regarding the alleged errors, and most of them appear to be merely typographical errors in the trial transcript. Wax's conclusion that the appellant had received substantial income was firmly grounded in evidence presented at trial.

The remaining claims of error do not merit discussion.

Judgment affirmed.