James H. Knowles and Gretchen R. Knowles v. Commissioner.
Knowles v. Commissioner
Docket No. 95347.
United States Tax Court
T.C. Memo 1965-27; 1965 Tax Ct. Memo LEXIS 303; 24 T.C.M. (CCH) 129; T.C.M. (RIA) 65027; February 15, 1965
John E. Laughlin, Jr., 2900 Grant Bldg., Pittsburgh, Pa., and William W. Scott, Jr., for the petitioners. Gerald Backer, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: [1] Respondent determined a deficiency in the income tax of petitioners for the year 1954 in the amount of $233,075.96. The issues for decisions are: (1) Whether certain shares of stock of the C.H.D. Corporation had a fair market value of $285,000 when petitioner James H. Knowles purchased them on September 23, 1954, from *304 the majority stockholders of C.H.D. Corporation for $1,000 and, if so, whether the sum of $284,000, representing the gain on the transaction, is taxable to petitioners in the year 1954 as compensation for services. (2) Whether the assessment of the deficiency is barred by the statute of limitations. Findings of Fact Some of the facts were stipulated by the parties and are hereby found accordingly. James H. and Gretchen R. Knowles (hereinafter sometimes called petitioners) are husband and wife, who reside at 1000 Highmont Road, Pittsburgh, Pennsylvania. They prepared on a cash basis and timely filed their Federal income tax return for the year 1954 on April 15, 1955, with the district director of internal revenue, Pittsburgh, Pennsylvania. In May 1954, Charles H. Dyson (hereafter called Dyson) became *305 interested in acquiring the stock of Hubbard and Company (hereafter called Hubbard). Hubbard was a Pennsylvania corporation organized in 1896. The company's principal activities were the manufacture and sale of pole line hardware, which was used mainly by electrical utility companies in the maintenance and construction of transmission and distribution lines; tools for railroads, construction operations and general purposes; and tapered aluminum products for use on traffic signals, street lighting, and related lines. A plant was located in Pittsburgh, Pennsylvania, and it had three other plants located in Chicago and East Alton, Illinois, and Oakland, California. Dyson was a certified public accountant who had previously been employed as a vice president of several textile corporations and who was in 1954 an advisor to several national corporations. He dealt mainly with and had extensive experience in matters of corporate administration and finance. In August 1948, James H. Knowles (hereafter called petitioner) became controller of Hubbard. One week later he was appointed assistant to the president of that company, a position which he held until appointed president on January 1, 1953. He *306 served as president of Hubbard until December 1, 1956. At all times material hereto and prior to July 14, 1954, all of the outstanding stock of Hubbard was held by Cora Hubbard Williams, who owned 1,766.3 shares, and her sister, Gretchen Pack Rose, who owned 1,094.2 shares. These two stockholders had both been directors of Hubbard for many years. Gretchen Pack Rose is petitioner's mother-in-law. Dyson visited the plants of Hubbard located in Pittsburgh and Chicago, reviewed some of its financial statements and a valuation report prepared by the First Boston Corporation, and spoke with various officers of the company. As a result, Dyson became interested in acquiring Hubbard because he felt the company had some future prospects. Dyson initiated negotiations with the two stockholders with a view to purchasing all of the stock of Hubbard. Early in June 1954, Dyson made an offer to them to purchase all of their stock. The two stockholders of Hubbard discussed the advisability of accepting Dyson's offer with various persons, including their attorney, the chairman of the board of Hubbard, and a family financial advisor. They read reports prepared by the First Boston Corporation with *307 respect to the condition and prospects of Hubbard. As a result of their investigation, discussions, and study, the two stockholders determined that it was undesirable for two women to continue owning any corporation the size of Hubbard. An additional consideration affecting their determination to sell their stock was the ill health of Gretchen Pack Rose, occasioned by a heart ailment. They negotiated with Dyson concerning the sale of the stock for about one week. Finally, on June 11, 1954, they granted Dyson an option to purchase all of the outstanding stock of Hubbard for a price of $4,500,000. Dyson paid them $8,000 in cash for the option. Petitioner took no part in these negotiations. He did not attend any meetings at which the negotiations took place. Prior to the time Dyson made an offer to purchase the stock, petitioner neither knew that such an offer would be made nor the price Dyson would offer. Petitioner took no position as to the acquisition of the Hubbard stock by Dyson. He was informed that the option had been granted and was shown a copy thereof after it was granted by the two stockholders. On June 18, 1954, the stock certificates of the two stockholders of Hubbard *308 were delivered to a financial institution as escrow agent, under an agreement which provided for the delivery of such stock certificates to Dyson or his order upon the payment of $4,543,000 to the escrow agent. The increase in the price stated in the escrow agreement over that stated in the option reflected the amount of a dividend, declared but not paid, which was included in the sale price of the stock. Although Dyson did not have sufficient personal funds to finance the purchase of Hubbard stock, he believed he had sufficient support in financial institutions to work it out. Dyson was able to arrange the short term initial financing of the purchase with the First National Bank of Boston, with which he had previously dealt, in a relatively short time. He did not, however, receive final commitments from the bank and an insurance company for long-term financing until sometime between July 14, 1954, and the end of September 1954. On July 1, 1954, Dyson, at the suggestion of the First National Bank of Boston, caused the C.H.D. Corporation to be formed under the laws of the State of Delaware, with an authorized capital stock of 10,000 shares of common stock of a par value of $1 each. *309 All of the authorized stock of C.H.D. Corporation was issued for cash at such par value on July 9, 1954, as follows: Number
Name of Stockholder
of Shares
Charles H. Dyson
2,900
Margaret M. Dyson
2,900
Charles H. Dyson and William E.
Stockhausen, as Trustees
4,000
William E. Stockhausen
200 Margaret M. Dyson was the wife of Charles H. Dyson and William E. Stockhausen was attorney for Dyson and C.H.D. Corporation. On July 9, 1954, Dyson assigned the option to purchase the stock of Hubbard to C.H.D. Corporation. To finance its purchase of the Hubbard stock, C.H.D. borrowed from the First National Bank of Boston $4,600,000 on a 90-day note dated July 14, 1954. The escrow of the stock of Hubbard was closed and the sale and delivery of the stock completed on the same day when the total purchase price of $4,543,000 was paid, $2,803,061.36 to Cora Hubbard Williams and $1,739,938.64 to Gretchen Pack Rose. The transactions were concurrent. The only collateral for the 90-day note was the shares of Hubbard stock so purchased and the note was not personally guaranteed. Dyson intended that the 90-day note would be paid from existing assets and long-term borrowings *310 by Hubbard. The note given to the bank was paid by a $4,600,000 dividend from Hubbard to C.H.D. Corporation which was not taxable because C.H.D. had filed a consolidated return with Hubbard. To finance the dividend, Hubbard used $900,000 of its own assets and borrowed $3,700,000 from the First National Bank of Boston and the John Hancock Mutual Insurance Company, payable over the succeeding 12 1/2 years. At the time C.H.D. purchased the stock of Hubbard, Dyson had not formed an opinion of petitioner's ability or decided whether or not he should continue as an officer or employee of Hubbard. Petitioner was absent from Pittsburgh for several weeks during July 1954. When he returned on July 29, 1954, he had his first conversation with Dyson concerning continuance of his employment by Hubbard. At that meeting petitioner advanced constructive ideas for the conduct of Hubbard's business, and Dyson advised petitioner that he desired him to continue as president of Hubbard. Neither of the petitioners was related by blood or marriage to Charles H. Dyson or Margaret M. Dyson. For the year 1953 petitioner received a salary of $35,000 from Hubbard for serving as its president. For the year *311 1954 he received a salary of $44,583.36. On September 23, 1954, Dyson and his wife each sold to petitioner 500 shares of the common stock of C.H.D. Corporation for a total price of $1,000. The purchase price of such stock was $1 per share, the same amount which had been paid for the stock by Dyson and his wife when it was issued on July 9, 1954. Such stock was sold to petitioner as an inducement for him to continue as president of Hubbard and to spur and improve the operations and profits of Hubbard. On the date that he purchased the C.H.D. stock, petitioner entered into a written agreement which provided that (1) in the event petitioner should receive a bona fide offer to purchase any or all of petitioner's stock in C.H.D., Dyson should have the right to purchase the stock at the same price during a period of 15 days after notification of the existence of such offer; and (2) in the event that Dyson received a bona fide offer to purchase all of the outstanding stock of C.H.D. Corporation at a price not less than 75 percent of the then current book value thereof, petitioner would deliver his stock certificates to Dyson for sale, sharing in the proceeds on a pro-rata basis. At the *312 time of the transfer of the 1,000 shares of C.H.D. Corporation stock to petitioner, Dyson was not in any financial difficulty. The Dysons did not intend to make any gifts to petitioner nor did they ever make gifts to petitioner. On September 23, 1954, the date of the transfer to petitioner of the 1,000 shares of C.H.D. stock, C.H.D. had not yet received the $4,600,000 dividend from Hubbard, and the C.H.D. balance sheet reflected the Hubbard stock as an asset and the 90-day note as a liability. However, at that time Dyson had commitments from financial institutions for long-term loans to pay the 90-day note. The name of the C.H.D. Corporation was changed to The Dyson Corporation on December 28, 1955. On December 12, 1956, William E. Stockhausen, secretary of The Dyson Corporation, delivered to John E. Laughlin, Jr., certificate No. 5 for 1,000 shares of common stock ( $1 par) of The Dyson Corporation registered in the name of petitioner, which certificate was in substitution and exchange for certificates Nos. 6 and 8, each for 500 shares of the common stock of the former C.H.D. Corporation. Petitioner continued as president of Hubbard until December 1, 1956, when his employment *313 was terminated. It was felt that since he was no longer to be employed by Hubbard, he should also sever his ownership interests in The Dyson Corporation (C.H.D.). The Dyson Corporation purchased petitioner's 1,000 shares for $285,000 on May 31, 1957. The $285,000 purchase price was a compromise figure arrived at principally by taking 10 percent of the earnings of Hubbard and its subsidiary, Hubbard Specialty Products, Inc., for the years 1954, 1955, and 1956, which amounted to $689,000, $838,000 and $1,072,000, respectively. It was intended, by taking 10 percent of the aggregate earnings of Hubbard, to measure the increase in the equity in the petitioner's C.H.D. stock for the time he operated Hubbard for the Dysons. For ease of computation, all of the 1954 earnings were used, although petitioner was associated with the Dysons for only part of that year. The aggregate earnings for the years 1954, 1955, and 1956 were $2,600,000, 10 percent of which was $260,000. However, there were certain nonrecurring expenses in those years and the additional $25,000 was in recognition thereof. Petitioner thought he was entitled to a higher price since C.H.D. had acquired other properties during *314 the period that petitioner owned its stock. These properties were specifically excluded from the computation because Dyson felt that the petitioner was only entitled to his efforts as far as Hubbard was concerned. Petitioner received the $285,000 purchase price in 1957 and reported a long-term capital gain of $284,000 measured by the $285,000 he had received from the sale of the 1,000 shares of The Dyson Corporation (formerly C.H.D.) common stock and the $1,000 cost basis. The following are balance sheets of C.H.D. Corporation on June 9, 1954, after the purchase of all of its outstanding stock; on June 9, 1954, after the acquisition of an option to purchase Hubbard stock; on September 23, 1954; and on December 31, 1954: June 9, 1954
Cash
$ 10,000.00
Total assets
$ 10,000.00
Capital stock
$ 10,000.00
$ 10,000.00
Cash
$ 2,000.00
Option to purchase Hub-
bard stock
8,000.00
Total assets
$ 10,000.00
Capital stock
$ 10,000.00
$ 10,000.00
September 23, 1954
Cash
$ 51,716.24
Investments - Hubbard
4,551,000.00
Total assets
$4,602,716.24
Liabilities: 90-day demand note
$4,600,000.00
Capital stock
10,000.00
Surplus
( 7,283.76)
$4,602,716.24
December 31, 1954
Cash
$ 23,216.67
Investments - Hubbard
4,551,000.00
Total assets
$4,574,216.67
Capital stock
$ 10,000.00
Earned surplus
4,564,216.67
$4,574,216.67
*315 The following is the balance sheet of Hubbard as of December 31, 1953: Assets
Cash
$ 1,608,411.09
Notes and accounts receivable
$3,011,375.57
Less: Reserve for bad debt
32,534.22
2,978,841.35
Inventories [1]
4,965,784.96
Government securities
130,866.20
Other investments
Stocks in affiliated corporations
$ 384,197.43
Stock in other corporations
29,470.45
Bonds
1,000.00
414,667.88
Capital assets
Buildings
$2,686,915.79
Machinery and equipment
3,175,559.34
Furniture and fixtures
148,663.15
Autos
167,178.73
$6,178,317.01
Less: Reserve for depreciation
2,574,870.51
3,603,446.50
Land
274,671.15
Other assets
Prepaid insurance
88,640.69
Loans and miscellaneous receivables
229,412.29
Total assets
$14,294,832.11
Liabilities
Accounts payable
$ 796,704.81
Accrued Federal income taxes
$ 576,199.25
Accrued other expenses
411,138.87
987,338.12
Surplus reserve
Reserve for price adjustment
155,054.54
Capital stock - common
286,050.00
Surplus
12,069,684.64
Total liabilities and capital
$14,294,832.11
*316 The following is the balance sheet of C.H.D. Corporation and Hubbard and Company Consolidated as of December 31, 1954: Assets
Current assets
Cash
$ 2,911,111.94
Accounts receivable
Customers
1,919,753.47
Officers and employees
22,933.52
Miscellaneous
96,949.70
$ 2,039,636.69
Allowance for doubtful
accounts
( 32,691.35)
$ 2,006,945.34
Inventories [1]
Finished products
$ 1,574,588.48
Work in process
388,434.98
Raw materials and sup-
plies
2,081,142.37
$ 4,044,165.83
Prepaid expenses
$ 98,183.06
Total current assets
$ 9,060,406.17
Noncurrent accounts receiv-
able
$ 899,000.00
Property, plant and equip-
ment
Buildings
$ 3,128,355.74
Furniture and fixtures
164,040.43
Equipment
3,449,014.45
Automobiles
168,646.16
$ 6,910,056.78
Accumulated depreciation
2,840,906.39
$ 4,069,150.39
Land
307,113.65
$ 4,376,264.04
$14,335,670.21
Liabilities
Current liabilities
Portion of notes payable
due within one year
$ 658,856.72
Accounts payable trade
$ 570,781.31
Accrued liabilities
Payroll
$ 382,794.92
Taxes other than income
taxes
90,573.51
Commissions and royalties
35,441.35
Federal and State income
taxes
573,391.53
Other
58,107.61
Total current liabilities
$ 2,369,946.95
Notes payable - payable after
one year
$ 3,287,000.00
Capital stock
$ 10,000.00
Earned surplus
8,668,723.26
$ 8,678,723.26
$14,335,670.21
*317 The following is a schedule of the net sales and net income before and after taxes of Hubbard for the years 1948 to 1954, inclusive: Net
Net
Dividends
Income
Federal
Income
Paid
Before
Income
After
(Nearest
Year
Net Sales
Taxes
Taxes
Taxes
Thousand)
1948
$18,865,961
$1,510,312
$ 562,539
$ 947,773
$ 349,000
1949
15,185,454
524,743
197,715
327,028
283,000
1950
20,918,754
2,619,812
1,286,295
1,333,517
283,000
1951
26,963,010
3,837,945
2,137,657
1,700,288
246,000
1952
$20,744,199
$1,786,929
$1,066,044 [1]
$ 720,885
$ 172,000
1953
19,141,641
1,123,557
576,199
547,358
172,000
1954
22,365,765
1,111,186
582,032
529,154
4,600,000
Petitioners did not, within 3 years following the due date for the filing of their joint Federal income tax return for the taxable year 1954, the actual date of filing such return, execute, or cause to be executed in their behalf, any agreements extending the period of assessment of *318 income taxes for such year. In such income tax return the petitioners reported gross income in the amount of $57,358.88. In the return they made no disclosure of the transaction whereby the petitioner acquired 1,000 shares of the stock of C.H.D. Corporation from the Dysons. Petitioners on March 8, 1961, and respondent on March 23, 1961, executed a modified Form 872 (Consent Fixing Period of Limitation Upon Assessment of Income and Profits Tax) extending the period of assessment of tax under the provisions of section 6501(e), Internal Revenue Code of 1954, to June 30, 1962, provided, however, that if a notice of deficiency in tax was mailed to them on or before said date, then the time for making an assessment would be extended beyond said date by the number of days during which the making of an assessment is prohibited and for 60 days thereafter. In his notice of deficiency dated and mailed to petitioners on September 19, 1961, respondent determined that the value of the C.H.D. stock on September 23, 1954, was $285,000 and that petitioners realized gain of $284,000 taxable as compensation for services in the year 1954. Ultimate Findings 1. On September 23, 1954, the *319 fair market value of 1,000 shares of C.H.D. Corporation stock was at least $285,000. 2. In 1954, petitioner realized and failed to report ordinary income of $284,000 resulting from the transfer to him of 1,000 shares of C.H.D. Corporation stock. 3. Petitioners omitted an amount in excess of 25 percent of gross income in their joint Federal income tax return filed for the taxable year 1954. 4. The assessment of the deficiency for the year 1954 is not barred by the statute of limitations. Opinion It is stipulated that respondent did not issue a statutory notice of deficiency to petitioners within 3 years from the date they filed their 1954 income tax return and that petitioners did not execute a consent to extend the period of limitation for assessment during the 3 years following the filing of their return. In his answer to the petition filed in this proceeding, the respondent has specifically alleged the omission from petitioners' gross income of an amount in excess of 25 percent and the extension of the period of limitation on assessment from 3 to 6 years. Both parties recognize that *320 the burden of proving exceptions to a prima facie showing of the running of the time for assessment and collection of tax is upon the respondent. Farmers Feed Co., 10 B.T.A. 1069 (1928); C.A. Reis, 1 T.C. 9 (1942); and Elsie SoRelle, 22 T.C. 459 (1954). It is incumbent upon respondent to prove the exception he alleges by clear and convincing proof. The main issue in this case is the fair market value of the 1,000 shares of stock of the C.H.D. Corporation sold to petitioner by the Dysons on September 23, 1954. The great disparity in values between respondent and petitioner - $285,000 and $1,000 respectively for the 1,000 shares - results principally in the different approaches they use in determining the value of stock of a closely-held holding company which owns all of the stock of one operating company. It is the respondent's position that the assets and earnings of the operating company are the essence of, and are material to, the valuation of the holding company stock. Petitioner, on the other hand, contends that the C.H.D. Corporation stock should be valued solely on the basis of prospective cash dividends from Hubbard, the operating *321 company, totally disregarding the assets and retained and reinvested earnings of Hubbard. We agree with the respondent. We think his approach to the valuation of the C.H.D. stock is proper. A determination of the value of shares of stock of a closely-held corporation is a question of fact to be decided by an analysis of the particular financial circumstances of the company and other relevant economic factors. Kline v. Commissioner, 130 F. 2d 742 (C.A. 3, 1942); and Hamm v. Commissioner, 325 F. 2d 934 (C.A. 8, 1963), affirming a Memorandum Opinion of this Court. We have recognized that both the assets and the retained and distributed earnings (total earnings) of the operating subsidiary are a necessary element in computing the value of the stock of the parent holding company. Mary A. B. duPont Laird et al., Executors, 38 B.T.A. 926 (1938). Respondent's determination of a value of $285 a share for the C.H.D. stock on September 23, 1954, is supported by the testimony of two well-qualified expert witnesses who have had considerable experience in *322 valuing the stock of closely-held companies. In valuing the C.H.D. stock, these witnesses considered such factors as earnings, book value, working capital, current asset value, economic conditions, management potential, business prospects and comparisons with more widely-held similar companies. In addition, consideration was given to the fact that this acquisition of the stock by the Dyson interests was financed by $900,000 of Hubbard assets and a longterm indebtedness of $3,700,000. The respondent's witnesses also took into account the fact that a minority interest was involved and the restrictions imposed by Dyson at the time the petitioner acquired the stock. After considering all of these factors, the respondent's witnesses both testified to values in excess of $285 per share. By contrast, the petitioner offered no expert testimony with respect to the value of C.H.D. stock. His major contention is that the Dysons contributed $1 a share at the formation of C.H.D. and some 60 days later the stock had exactly the same value. It is important, we think, that $1 a share was only the cash contribution of Dyson. He also contributed his financial experience, his business acumen, his *323 connections with financial institutions, and the time and effort spent in negotiating the transaction which resulted in the creation of C.H.D. and the acquisition of the Hubbard stock. Moreover, when the Dysons contributed their $1 a share, C.H.D. was merely a corporate shell containing only the $10,000 contributed by the subscribers for its stock and had no income potential whatsoever. Yet some 60 days later it had already purchased all of the outstanding stock of a successful going business (Hubbard) which had earnings in 1954 of $50 attributable to a share of C.H.D. stock. Thus, at the time petitioner paid $1 a share, he was effectively acquiring a present equity in $50 of the Hubbard earnings for 1954 for each share he acquired. He was also acquiring a 10 percent equity in the earnings of Hubbard for years subsequent to 1954. This 10 percent equity in the future earnings of Hubbard certainly had a value in excess of $1,000. This is demonstrated by the fact that that very equity earned $285,000 during the period petitioner operated Hubbard for the Dysons. We know that Hubbard, whose stock was the principal asset of C.H.D., had been in business since 1896, and was in 1954 a manifestly *324 successful company. Just prior to September 23, 1954, it came under control of new management. The ownership was changed from two women disinterested in the operations of the company to Charles H. Dyson, a man with considerable experience in administration and finance, who had plans for Hubbard. He thought he could operate Hubbard successfully, and his view was shared by financial institutions willing to risk some $4,600,000 solely on the value of Hubbard. We know, too, that general economic conditions in 1954 were good. The financial statisties of C.H.D. and Hubbard on a consolidated basis, namely, earnings, net current assets and book value, all lead us to the conclusion that on September 23, 1954, the fair market value of 1,000 shares of C.H.D. stock was at least $285,000. The following chart depicts graphically the splendid financial circumstances of Hubbard both before and after the acquisition of C.H.D. At December 31, 1953
Net Current Assets
Net Current Assets
Current Assets
(Exclusive of
(Inclusive of
Minus Total
Net Worth
Inventory)
Inventory)
Liabilities
$12,069,684
$2,779,022
$7,744,806
$7,744,806
Per 1 Share of Outstanding C.H.D. Stock
$1,206 $277 $774 $774
At December 31, 1954
Net Current Assets
Net Current Assets
Current Assets
(Exclusive of
(Inclusive of
Minus Total
Net Worth
Inventory)
Inventory)
Liabilities
$ 8,678,723
$2,646,295
$6,690,460
$3,403,460
Per 1 Share of Outstanding C.H.D. Stock $868 $265 $669 $340
*325 Significant are the figures for net worth and current assets minus total liabilities of C.H.D. and Hubbard at December 31, 1954. In terms of C.H.D. stock, these amounted to $868 and $340, respectively, for each outstanding share of C.H.D. stock. These figures reflect the effect on Hubbard of the borrowing of $3,700,000 and the paying of a $4,600,000 dividend to C.H.D. Without considering fixed assets and noncurrent receivables and effectively treating them as having a zero value, the C.H.D. stock had a consolidated book value of $340 a share. Respondent's evaluation of $285, a discount of $55 a share from consolidated book value of current assets alone, or 16 percent, gives substantial cognizance to any negative features, including the fact that petitioner's 10 percent equity was a minority interest and he could not cause liquidation. Dyson, at the time he arranged for and C.H.D. purchased the Hubbard stock, felt that Hubbard had a value of $4,500,000, 10 percent of which would be $450,000. The respondent has determined that petitioner's 10 percent equity in Hubbard was worth $285,000. Utilizing the C.H.D. purchase price as a gauge, the respondent has allowed petitioner a discount *326 of some 37 percent from the price paid by C.H.D. This deduction recognizes the changes in circumstances between the C.H.D. purchase of Hubbard and that of petitioner's purchase of C.H.D. stock. Dyson was negotiating for the purchase of a corporation which had a net worth of $12,069,684. Petitioner was acquiring a 10 percent equity in a corporation which had a net worth of $8,678,723, the reduction in net worth being attributable in part to the fact that Hubbard expended $900,000 and incurred a $3,700,000 obligation to finance the purchase. When Dyson purchased the stock he was dealing with sellers who had lost interest in the business. When petitioner acquired the stock it was in the hands of able and aggressive new ownership. Considering the changes in circumstances, both pro and con, between the Dyson purchase and the petitioner's purchase, we think respondent has been fair in determining the value of a 10 percent equity to be $285,000, a reduction of $165,000 from the amount representing 10 percent of the C.H.D. purchase price. Although book values and other financial circumstances are *327 to be utilized in valuing the stock of a closely-held corporation, earnings are generally deemed to be a most important factor. Kline v. Commissioner, supra. The following chart sets forth the earnings of Hubbard alone from 1948 to 1954, inclusive, and the amounts of these earnings attributable to one share of the outstanding shares of stock of C.H.D. Per One
Share of
Outstanding
Year
Earnings
C.H.D. Stock
1948
$ 947,773
$ 94
1949
327,028
32
1950
1,333,517
133
1951
1,700,288
170
1952
720,885
72
1953
547,358
54
1954
529,154
52
Respondent's expert witnesses testified that eight times current earnings, or a capitalization rate of 12 1/2 percent, would be fair in the instant case. In the valuation report relied on by Dyson, a price earnings ratio of 8.4 to 1 applied to 1953 earnings was deemed appropriate. Applying a price earnings ratio of 8 to 1 to Hubbard earnings for each of the years 1953 and 1954 results in values of $432 and $416, respectively, for each share of C.H.D. stock. Here again, the values arrived at are substantially higher than the $285 determined by respondent. The following chart sets forth *328 the various values per share of C.H.D. stock attributable to consolidated book values of C.H.D. and Hubbard at December 31, 1954, and by applying a capitalization rate of eight times earnings for the 1953 and 1954 earnings of Hubbard applicable to one share of C.H.D. stock: Net Current
Curren Assets
Assets
Book
Minus Total
(Inclusive of
Capitalization of
Value
Liabilities
Inventory)
Earnings of Hubbard
1953
1954 $868 $340 $669 $432 $416
While petitioner criticizes the fact that respondent's expert witnesses used figures ranging between $500,000 and $550,000 as the annual earnings of Hubbard for capitalization purposes, these figures seem fair and amply supported by the record. In July 1954, when Dyson paid $4,500,000 for the stock of Hubbard, he deemed a capitalization rate of 8.4 times earnings to be appropriate, and the annual earnings figure capitalized was the 1953 earnings of Hubbard, some $547,000. Petitioner also comments that respondent's expert witnesses ignored the fact that C.H.D. stock only had a book value of 27 cents per share while arriving at a fair market value in excess of $300 a share. Respondent's *329 contention, and that of his witness, is that the consolidated book value of C.H.D. and Hubbard was the true test of book value. They considered and included in their valuation the fact that the net worth of C.H.D. and Hubbard on a consolidated basis was reduced by the $4,600,000 indebtedness incurred to purchase the Hubbard stock. Thus, we believe the petitioner is in error in ignoring Hubbard's net worth in determining book value. To some extent petitioner seems to be playing the role of "Janus" here. When he agreed to sell his C.H.D. stock for $285,000 in 1956 (receiving the proceeds of the sale in 1957), he suggested that the selling price of his C.H.D. stock be computed on 10 percent of the retained earnings of Hubbard during the period when he operated Hubbard for the Dysons. At that time, with one profile, he said to Dyson, 10 percent of C.H.D. is 10 percent of the total earnings of Hubbard. Now, with the other profile, he says to us that only Hubbard's distributed earnings should be considered in valuing C.H.D. stock. The inconsistency is glaring. Next we must decide whether the petitioner realized ordinary income in the amount of $284,000 when he purchased the 1,000 shares *330 of C.H.D. stock on September 23, 1954. The Supreme Court of the United States in the bellwether case of Commissioner v. LoBue, 351 U.S. 243 (1956), said that Congress, in defining "gross income" as broadly as it did, intended to tax all gains except those specifically exempted and held that an employee could not escape tax on a "bargain purchase" by contending that the stock was transferred to him as an investment rather than compensation. See also Geo. S. Carter, 36 T.C. 128 (1961); and sections 1.61-2(d)(1) and (4), Income Tax Regs. And later in Commissioner v. Duberstein, 363 U.S. 278 (1960), the Supreme Court held that the receipt of valuable property can constitute taxable gain even though it is not specifically bargained for as compensation for services. Plainly, the gain to petitioner was taxable in 1954 as compensation for services. It was not excluded by any provision of the Internal Revenue Code. It was not a gift because the Dysons did not intend to make any gifts to petitioner in 1954. It was not attributable to the ability, shrewdness, *331 and circumstances of petitioner as a buyer so as to consider the transaction a "bargain purchase" upon which gain is deferred until the property is sold or exchanged. Palmer v. Commissioner, 302 U.S. 63 (1937). Moreover, the fact that the sellers were majority stockholders of C.H.D. Corporation rather than the employer-corporation (Hubbard), a wholly-owned subsidiary of C.H.D., does not alter the result. See Van Dusen v. Commissioner, 166 F. 2d 647 (C.A. 9, 1948), affirming 8 T.C. 388 (1947). Respondent contends, and we agree, that the principle of the LoBue case controls here. To be sure, the surrounding circumstances point to compensation for services instead of a "bargain purchase." The transaction occurred at a time when petitioner's future role and connection with Hubbard were being decided. Before Dyson obtained control of Hubbard it was a family business owned by two sisters. Petitioner was not only the president of Hubbard, but he was also the son-in-law of one of the two dockholders. The sale to Dyson computely severed petitioner's family connection with Hubbard. In this atmosphere of changes, Dyson transferred to petitioner a 10 *332 percent equity in the business in order to insure his continued services to the new ownership. As we view it, the transaction was simply a means by which petitioner's services were secured and paid for. Furthermore, the purchase price was nominal, having no relation to the actual value of C.H.D. stock. Dyson was able to carry out a $4,500,000 purchase of Hubbard with a personal investment of $9,800. He accomplished this by using both the assels and the credit of Hubbard. He was able to borrow, without any personal guarantee, $4,600,000, pledging as security stock which he had just purchased for $4,500,000. Why would Dyson, after engineering this successful transaction, sell 10 percent of C.H.D. Corporation for $1,000? The Dysons were in no financial difficulty and had no need for $1,000. And it is inconceivable that the $1,000 was bargained for as a hedge against the collapse of Hubbard. Dyson was optimistic about Hubbard's prospects and financial institutions were willing to loan $4,600,000 with Hubbard stock as the only collateral. There was no rational economic basis for the sale of a 10 percent equity in Hubbard for $1,000 other than as a means of compensating petitioner for *333 the rendition of services. Compensation was surely the reality of the transaction. Finally, the 1957 sale demonstrates that compensation was the intendment of the 1954 transaction. In 1956 petitioner's services with Hubbard were terminated. At that time he agreed to sell his stock to Dyson for $285,000. It was felt that since petitioner had left the employ of Hubbard he should completely sever his ownership in C.H.D. Thus the parties themselves recognized there was a key and causal connection between petitioner's stock ownership and his employment. This attitude of the parties indicated that petitioner's service as president was the reason for giving him a 10 percent equity in 1954. If in 1954 the Dysons had been interested solely in selling a proprietary interest with no elements of compensation, there would have been no need for severing stock ownership in 1956. In addition, the manner of setting the sales price in 1956 is a further indication that the 1954 transaction constituted compensation. During the period when petitioner was president of Hubbard and an owner of C.H.D. stock, C.H.D. acquired additional properties. These properties were specifically excluded from the computation *334 of the sales price of $285,000. The sales price was computed on the basis of 10 percent of the earnings of Hubbard while petitioner was its president for the Dyson interests. Unlike petitioner, we do not regard respondent's view of the 1957 sale as a "blatant bootstrap bombast." Having determined that the petitioner realized gain of $284,000, taxable as compensation for services, in 1954, it is clear that the $284,000 was in excess of 25 percent of gross income ($57,358.88) reported by petitioners in their joint Federal income tax return filed for the taxable year 1954. Accordingly, the statute of limitations provided by section 6501(e)(1)(A) of the Internal Revenue Code of 1954, as extended by consents executed by petitioners and respondent, does not bar the assessment of the deficiency. Decision will be entered for the respondent. Footnotes
1. This case was heard by Judge Clarence V. Opper and briefs were duly filed. Judge Opper died on June 19, 1964. This case, not having been disposed of, was reassigned to Judge Howard A. Dawson, Jr.↩, on January 4, 1965, and notice was given to the parties that any request for rehearing or reargument might be presented to him within 30 days. No such requests have been received.
1. Inventories as reported on Federal income tax returns for the years 1953 and 1954 on the basis of "lower of cost or market."↩
1. Inventories as reported on Federal income tax returns for the years 1953 and 1954 on the basis of "lower of cost or market."↩
1. Includes excess profits tax of $147,223.↩